IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.P., | : | |
| Petitioner | : | **SEALED CASE** |
| | : | |
| v. | : | No. 1931 C.D. 2013 |
| | : | Submitted: April 25, 2014 |
| Department of Public Welfare, | : | |
| Respondent | : | |

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE MARY HANNAH LEAVITT, Judge
HONORABLE ROCHELLE S. FRIEDMAN, Senior Judge

OPINION
BY JUDGE LEAVITT                                    FILED: August 21, 2014

A.P. (Uncle) petitions for review of an adjudication of the Department of Public Welfare denying his request to expunge an indicated report that named him as a perpetrator of child abuse. In so holding, the Department's Bureau of Hearings and Appeals adopted, in its entirety, the recommended adjudication of the Administrative Law Judge (ALJ), which found that Uncle had sexually abused his nephew (Child), seven years earlier. We vacate and remand.

## Background

Child was born in 1992, and is the adopted son of Father and Mother. In high school, Child developed behavioral problems that led to an expulsion from high school and a drug arrest. In 2010, he entered an in-patient drug treatment facility. While a patient, Child accused a staff counselor of making a sexual advance. In the course of the investigation of this accusation, Child disclosed that

Uncle had sexually abused him five years earlier at a time when Uncle was living with Child's family.  Uncle moved in with the family in September 2005 because of his marital problems and moved out in August 2006.

The County Office of Children, Youth and Families (County) investigated Child's claim under Section 6338(a) of the Child Protective Services Law.[1]  On June 9, 2010, the County filed an indicated report of child abuse against Uncle.  The District Attorney has decided not to file criminal charges against Uncle.  Uncle requested expungement of the indicated report, on which the ALJ conducted two days of hearings.

The first day of the hearing, March 7, 2013, started with brief testimony from the County's investigator.  She explained that she interviewed both Child and Uncle before making her decision to issue an indicated report of abuse by Uncle.

---

[1] Section 6338(a) states in relevant part:

> When a report of suspected child abuse ... is determined by the appropriate county agency to be … an indicated report, the information concerning that report of suspected child abuse … shall be made in the Statewide central register.  Notice of the determination must be given to the subjects of the report, other than the abused child, and to the parent or guardian of the affected child or student along with an explanation of the implications of the determination.  Notice given to perpetrators of child abuse and to school employees who are subjects of indicated reports for school employees or founded reports for school employees shall include notice that their ability to obtain employment in a child-care facility or program or a public or private school may be adversely affected by entry of the report in the Statewide central register.  The notice shall also inform the recipient of his right, within 45 days after being notified of the status of the report, to appeal an indicated report, and his right to a hearing if the request is denied.

23 Pa. C.S. §6338(a).

Next, Child testified. He described the basement in his parents' home where Uncle stayed. Located in the basement was a recreation room with a kitchen, videogames, music equipment and a television and sofa; a second room used by the family for the computer; and a bedroom with bathroom. Two staircases led down to the basement from the first floor. The doors to the basement stairs do not have locks. The recreation room has sliding glass doors that open onto a patio and swimming pool.

Child testified about the first incident of alleged abuse. He stated that one evening he let Uncle into the house late at night. Uncle was in a business suit when he arrived home from work, but then changed into more comfortable clothing. The two watched a DVD entitled "When a Stranger Calls." Reproduced Record at 91a (R.R. ___). Uncle gave Child a "Mike's Hard Lemonade" that contained alcohol. While sitting on the floor watching the DVD, Uncle reached over and touched Child's "crotchal area." R.R. 98a. Then, at some point, Child's penis became exposed, *i.e.,* "out." Child stated that he did not know "how that part came about." R.R. 100a. Specifically, Child could not say if it was Uncle or Child who exposed Child's penis. *Id.* Uncle masturbated, but Child could not say which "of those two things happened first." R.R. 101a. The touching stopped without any talking then or afterwards. These incidents continued sporadically "once every other week" in the basement. R.R. 103a. Child did not remember if these incidents occurred in places other than in the basement. R.R. 104a.

Child testified that he became "more comfortable" with masturbation, stating:

3

A. As far as – just overall. That, you know – and I – the more comfortable I guess I became with, like kind of just my – doing things to myself and –

Q. When you were doing things to yourself, was he doing anything?

A. Yeah. Again, not every time. It was sometimes – he was mas-____ I didn't really look over too much.

Q. Okay.

A. Maybe. Most of the time – actually, I rarely ever did. So –

Q. Did you ever see him doing anything?

A. Well, like, if I'm – I see it, like, out of the corner of my eye but I – it's not necessarily that I always paid attention.

Q. Okay. What did you see out of the corner of your eye?

A. Well, like a motion. Like – like, the motion of masturbation. I – again, even at the time I don't know if I was cognizant of it. I don't know if I – remember happening and when I became cognizant of what that was, but now I – now I –

Q. Was there ever any oral sex that occurred?

A. Not that I remember.

R.R. 105a.

On cross-examination, Child was unable to date the first incident of this side-by-side masturbation. He could not say whether it was before or after Christmas, but he stated that it took place after Uncle had been living with the family for a while. He could not recall whether he was wearing sweatpants or pajamas, a t-shirt or sweatshirt. Child testified that he did not see Uncle's penis during the above-described incident. R.R. 125a. To the police, however, Child stated that Uncle had exposed himself. R.R. 21a. Child stated that he was 13

4

when the first incident occurred but told juvenile probation officers that he was 11. R.R. 135a. He also told police that 30 to 40 such incidents occurred over a six to seven month period. On redirect by the County, Child again stated that what he saw was a "masturbation motion" by Uncle but not his penis. R.R. 138a.

Next the County called Father to testify. Father stated that one time, after Uncle moved out of the house, Uncle invited Child and Child's brother to join Uncle and Uncle's son for a "boys night." R.R. 149a. Child declined the invitation. Otherwise, Father did not notice Child "shying away" from Uncle. R.R. 150a. Father believed Child's accusation.

Testifying for Uncle was D.C. (Girlfriend), with whom Uncle had a relationship during the time he lived with Child's family. Girlfriend testified that she and Uncle started dating in March 2005. When Uncle's wife discovered their relationship, Uncle moved out of his marital home and began spending most nights at Girlfriend's house. R.R. 186a. Girlfriend testified that after Uncle obtained partial custody of his son in January 2006, he virtually never spent the night at his brother's house without his son also being present. Girlfriend testified as follows:

> Q. And when he stayed at your house – and again in September October time frame – when he stayed at your house, how would he get to work then?
>
> A. He would actually come – as time progressed, he would come with overnight clothes. If he was traveling, he would have a suitcase and he would drive to my house. And then if he was leaving either for work or to travel, he would go to the train station and take – most of the time as I recollect – take [public transportation downtown].
>
> Q. Let's move a little bit forward. I think you said in that sentence – September, October time frame – he stayed

5

often. Did the frequency change at all in or around the end of November?

A. It just became more and more frequent. I mean, the relationship progressed. He was staying at my place quite often[,] periodically he would make a presence at [Brother's name], and he was getting a new set of clothing for the next week [or] whatever. But it was very frequent. I mean, we came close to – and then eventually living together.

R.R. 187a. She stated that because Uncle would not bring his son to her house, the couple had less time together, given Uncle's travel. The relationship ended, and they have not dated in over six years.

Uncle also called a police officer who investigated Child's accusation. The officer did not know what happened with respect to Child's accusation against the counselor at the drug treatment facility. He did know that the District Attorney had decided not to institute criminal charges against Uncle because Child's accusation lacked any corroboration. On cross-examination by the County, the officer confirmed that he told Father that he believed Child. R.R. 173a. The officer explained that he believes every witness's statement about a crime, until the statement is proven false.

Next to testify was Child's cousin (Cousin). Cousin, a college student, testified that she and Child were very close growing up because they were the exact same age. She reported an incident that took place in the summer of 2010 when, at his request, she drove Child to a meeting with his probation officer. Child's parents were overseas, and Child was not allowed to stay at their house while they were away. Cousin raised the issue of Child's accusation of Uncle and described Child's response as follows:

6

Q. And what was his reaction?

A. He put his head in his hands kind of, and he kind of slouched over and he just started rambling. And all I remember is that he did not say that it happened. Through all the rambling, he did not come out and tell me that it happened. As close as we were growing up and everything it was – I was expecting him to confide in me and tell me if it happened. I mean, I was basically accusing him – I was basically telling him like, these lies you're telling – do you know what you're doing to our family? That was his chance to tell me it happened. I'm telling you it happened. And he did not do that at all.

R.R. 181a. Cousin also went on to state:

Ever since we've been little, he's been known as kind of a liar and someone who blames others for what he does. I – all the time when we were little there were always instances.

*Id.*

The next witness to testify was Child's Paternal Grandmother. She described the basement of Father's home, including the bedroom where she stayed when she visited from Florida for a month at a time. This was the room occupied by Uncle during his separation from his wife. She testified that Child was "not truthful. Never truthful. Never," R.R. 198a, and that "[h]e lied about everything." R.R. 199a. She also testified that Uncle's reputation was as a "very moral" person. R.R. 203a.

The last two witnesses on the first day of the hearing were Child's other paternal uncles. Paternal Uncle I testified that his brother, Uncle, had a reputation for being truthful and having "great moral character." R.R. 211a. He also testified that Child "had a reputation of lying to, you know, to save his own

7

hide." R.R. 210a. Paternal Uncle II testified that everyone loved Uncle and that he enjoyed a reputation for truthfulness and a high moral character. R.R. 215a.

The hearing resumed one month later. Uncle was the first to testifiy. He explained that he has an MBA in finance. Since graduating from college, he has held a variety of positions in the financial sector. For several years, he did consulting from his home and took care of his son; this allowed his wife to work at her job in sales. After the couple had their second child, Uncle took a position with a large company doing financial compliance audits throughout the U.S. and Canada. These trips took place two times a month, and each trip lasted three to four days. His marriage foundered in 2005, but he and his wife reconciled in 2007. In 2010, they again separated and are now divorced.

Uncle testified that he spent nights at Girlfriend's home between September 2005 and January 2006 because it was closer to his job downtown and to his marital residence, which allowed him to help his wife with the two children, one of whom was an infant. In January 2006, Uncle obtained partial custody of his six-year-old son, who spent every other weekend at Father's home with Uncle. Uncle's daughter was still too young for overnight visits. Uncle testified that other than those weekends, he could recall staying at Father's home only a few nights a month after January 2006. He presented his paper calendar from that period, which documented his busy schedule, including out-of-town travel and visits with his children.

Uncle denied that he had ever watched a movie alone with Child, in any room, or that he ever gave him alcohol. He described learning of Child's accusation by phone call from his brother while on a business trip to Chicago:

8

He said, "you know, [Child's] in [name of drug treatment facility]." And he said – told me what [Child] had said. "[Child] said that you touched him and you masturbated in front of him." And, you know, I was shocked. I was repulsed it.

And, you know, I said, "[Father's name] I never did any of those things."

And he said back to me, he said, "I know. [Child] is a bit – a habitual liar." He said, "He engages in different types of lying. I believe you 98 percent, but because he's my son," he's saying, "yet I got to believe him 2 percent."

We had subsequent conversations on the phone after that and he had more to say.

R.R. 287a.

In response to questioning by his counsel, Uncle denied Child's accusation as follows:

Q. [Y]ou've heard your nephew testify about these things he's claiming happened down in that basement?

A. Yes.

Q. Inappropriately touching him, masturbation, things of that nature. Did you do anything of those things that he described?

A. No, I have not. These allegations are hideous. You'd have to be a monster to do that. And I know people in this room aren't going to get to know me in one day. But I am not a monster, and I've waited three years [to] say under oath that I never did those things to him.

Q. And what kind of effect have these allegations had on you?

County Counsel: Objection. Irrelevant.

Uncle's Counsel: Oh, I think they're very relevant, your Honor. I think in light of the opinion that we have from the – from the G.V. case, from last summer, protection of reputation

9

is vital. It's a constitutional right to have your reputation protected. And that's what that Court has held.

R.R. 292a.

The County then called Father and Mother to rebut several of Uncle's statements, such as whether Child had ever let Uncle into the house late at night; how many nights Uncle spent at their house; and how often Uncle drove Child to school, on his way to the lot where he parked his car and picked up public transportation. Mother testified that Uncle spent approximately 20 or 25 days a month at their home and "often" took Child to school. Father acknowledged that when he called Uncle about Child's allegations he believed Uncle's denial. R.R. 325a.

The ALJ recommended that Uncle's appeal be denied. The ALJ found Child's testimony "very credible" and sufficiently clear and detailed to meet the clear and convincing standard of proof. He found that the abuse began in May of 2006 and ended several months later when Uncle moved out. The ALJ found Uncle's paper calendar not reliable because it could have been altered; however, the ALJ used the paper calendar to count 60 days out of four months when Uncle was in town and not traveling. The ALJ found Father and Mother credible. He found Uncle not credible, and he found the witnesses who testified on the reputation for honesty held respectively by Uncle and by Child not credible because they were biased. Accordingly, the ALJ found Uncle to be a perpetrator of abuse.

10

On appeal,[2] Uncle raises three issues. First, he contends that the Department erred in refusing to expunge the report from the ChildLine and Abuse Registry (ChildLine Registry)[3] because the County's evidence did not meet the clear and convincing standard of proof. Second, he contends that the Department erred because the evidence presented by Uncle outweighed Child's uncorroborated testimony. Third, he contends that the Department erred in its arbitrary and capricious disregard of the evidence.

## Standard of Proof

Under the Child Protective Services Law, a county may file an indicated report of child abuse that names a perpetrator of child abuse. 23 Pa. C.S. §6338(a). The indicated report is based solely on the county's investigation.[4] A

---

[2] Our review determines whether constitutional rights were violated, whether errors of law were committed or whether necessary findings of fact are supported by substantial evidence. *P.R. v. Department of Public Welfare*, 759 A.2d 434, 436 (Pa. Cmwlth. 2000).

[3] ChildLine is a unit of the Department that operates a Statewide toll free system for receiving reports of suspected child abuse, refers the reports for investigation and maintains the reports in the appropriate file. 55 Pa. Code §3490.4; 23 Pa.C.S. §6332. The ChildLine Registry is maintained in accordance with the Child Protective Services Law, 23 Pa.C.S. §§6301–6386.

[4] In his concurring opinion in *G.V. v. Department of Public Welfare*, 91 A.3d 667, 676 (Pa. 2014) (*G.V. II*) (Saylor, J. concurring), Justice Saylor wrote as follows:

> I agree with the majority that the statutory preponderance-based standard meets basic due-process requirements. I would only observe that the inquiry into whether the Pennsylvania statute reflects adequate process remains seriously in question.

Justice Saylor also quoted from the *amicus curiae* brief filed by the Pennsylvania State Education Association, which listed "numerous due process irregularities such as the lack of pre-[deprivation] notice and hearing, failure to provide a prompt post-determination hearing and the commingling of investigative, prosecutorial and judicial functions when caseworkers who are inexperienced in the law investigate complaints, weigh evidence and judge whether to issue an indicated report." *Id.* at 676 n.2.

hearing does not take place unless and until the perpetrator challenges the report. 23 Pa. C.S. §6341(c). There is no administrative pleading that precedes this hearing that identifies the facts the county intends to prove, and there is no pre-hearing discovery. The hearing, where the county bears the burden of production and proof, is conducted by an ALJ appointed by the Department. The ALJ makes recommended findings of fact and conclusions of law, which may be accepted or rejected by the Bureau of Hearings and Appeals. From there, either party may seek reconsideration from the Secretary of Public Welfare.

In *G.V. v. Department of Public Welfare,* 52 A.3d 434 (Pa. Cmwlth. 2012) (*G.V. I*), *reversed,* 91 A.3d 667 (Pa. 2014) (*G.V. II*), this Court held that a county must prove its case by the clear and convincing evidence standard of proof, as opposed to the preponderance of evidence standard. We explained that this more exacting standard was appropriate because of the indicated report's impact upon an alleged perpetrator's ability to earn a living as well as the "potential loss of reputation and stigma associated with being named a child abuser." *G.V. I*, 52 A.3d at 444.[5] In addition, these cases present other evidentiary challenges. The

_____

[5] The law recognizes three standards of proof: preponderance of the evidence, clear and convincing evidence and proof beyond a reasonable doubt. The "preponderance of the evidence" standard is the lowest of the three standards and means that the fact finder must be satisfied that the evidence shows that a fact is probably true, *i.e.*, more likely true than not. *Agostino v. Township of Collier*, 968 A.2d 258, 269 (Pa. Cmwlth. 2009). Conversely, the "beyond a reasonable doubt" standard is the highest standard of proof and applies to criminal proceedings that impact an individual's liberty interest, an interest worthy of the highest protection. *Commonwealth v. Donough*, 103 A.2d 694, 697 (Pa. 1954). Between these two lies the "clear and convincing" standard of proof. This Court has explained that this standard of evidence requires evidence so "clear, direct, weighty, and convincing as to enable either a judge or jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Suber v. Pennsylvania Commission on Crime and Delinquency*, 885 A.2d 678, 682 (Pa. Cmwlth. 2005).

actual abuse may be physically demonstrable but the identity of the perpetrator unknown. The child victim may be too young to understand the abstract concept of truth; may be influenced by an adult; or may be motivated by animus toward the accused perpetrator.

In *G.V. II*, our Supreme Court reversed this Court's holding that the County must make its case under the clear and convincing standard of proof. The Supreme Court held that the statutory standard set forth in Section 6303(a) of the Child Protective Services Law governs expunction hearings. 23 Pa. C.S. §6303(a). The concurring opinion of Justice Baer further explained that the standard of proof is the "well-known civil standard of preponderance of the evidence." *G.V. II*, 91 A.3d at 679 (Baer, J., concurring). In his concurring opinion, Justice Saylor agreed with Justice Baer on this point but cautioned against conflating the statutory standard at 23 Pa. C.S. §6303(a) with the "substantial evidence standard prevailing on appellate review under Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704." *Id.* at 674 (Saylor, J., concurring). Justice Saylor then explained the material difference. The statutory standard incorporates a "weighing dynamic." *Id.* "Traditional appellate substantial-evidence review, on the other hand, omits all such weighing – instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *Id.*

In sum, in an expunction hearing the standard of proof is preponderance of the evidence, and the statutory standard for the evidence is

13

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a). Uncle asserts, *inter alia,* that the ALJ did not comply with this statutory standard.

It goes without saying that an appellate court may not find facts or reweigh the evidence. *B.B. v. Department of Public Welfare*, 17 A.3d 995, 999-1000 (Pa. Cmwlth. 2011). Nevertheless, whether the County's evidence satisfied the standard set forth in the statute is a question of law. *Kirkwood v. Unemployment Compensation Board of Review*, 525 A.2d 841, 844 (Pa. Cmwlth. 1987).

## Appeal

Uncle argues that the County failed to offer clear and convincing evidence to support the indicated report of child abuse. The standard of proof is no longer clear and convincing evidence. As explained by the Pennsylvania Supreme Court, the statutory standard requires the factfinder to undertake a "weighing dynamic." *G.V. II*, 91 A.3d at 674 (Saylor, J. concurring). This "weighing dynamic" should not be conflated with the appellate court's review of the record to determine whether it contains support for the agency's factual findings. *Id.*

Uncle contends that Child's testimony is flawed and does not outweigh Uncle's evidence. First, he contends that the evidence was overwhelming that Child does not enjoy a reputation for telling the truth, and this evidence was not rebutted. Second, there are discrepancies in Child's account of the abuse. For example, the DVD that Child stated was playing during the first incident of abuse was released in May 2006, at a time Uncle was living primarily

14

at Girlfriend's home, except on weekends when he had custody of his son. The indicated report stated, however, that the first incident of abuse took place in 2005. Likewise, there are significant inconsistencies between Child's testimony and the statement he gave the police. Third, Child's memory was poor. He could not be specific about how often the abuse took place or what he was wearing during the first incident. He could "not remember" if these incidents included oral sex. Child admitted to confusion. Most problematic is that Child said nothing about the alleged abuse to anyone, such as a teacher, a friend, or even his younger brother, for five years.

By contrast, Uncle argues that his witnesses, persons with no interest in the outcome of the proceeding, were consistent. However, the ALJ arbitrarily and capriciously disregarded their testimony. Uncle's testimony was supported by demonstrative evidence, such as his calendar and a photograph of Uncle, Child and Cousin, all looking relaxed and happy, that was taken four years after the alleged abuse. Noting that Child stated that the abuse happened 30 to 40 times over a six to seven month period, Uncle points out that the evidence was unrebutted that he spent most nights at Girlfriend's house after November or December 2005, unless he was traveling. He consistently spent weekends at Father and Mother's residence only after he obtained partial custody of his son in January 2006, and had his son with him for those weekends. Uncle argues that this evidence coupled with his busy travel schedule rebuts Child's claim that Uncle abused him over a period of months, once or twice a week.

The ALJ explained that he found Child credible because he responded to questions without embellishment or anger. The ALJ noted that Child

remembered the name of the movie that was playing during the first incident of abuse and was candid about his feelings during that incident. Moreover, the ALJ found that while Child reported to the police that there were 30 to 40 incidents of abuse, the exact number did not affect Child's credibility because such discrepancies were minor and not unusual considering the fact that he was testifying about events that had occurred seven years earlier. Because of the passage of time, Child was no longer motivated to fabricate a story to avoid getting into trouble. In fact, the ALJ noted that Child faced alienation and anger from the rest of his family by standing by his claim of abuse.

Conversely, the ALJ found Uncle's testimony not credible. The ALJ reviewed Uncle's calendar and found that there were many nights when Uncle was not travelling between the months of May 2006 and August 2006. Further, the ALJ found it was highly unlikely that Uncle slept most nights at Girlfriend's home because he did not move all his clothes there but continued to store his clothing at his brother's home. The ALJ did not believe Uncle's statement that he drove Child to school only a few times. Instead he credited Father's and Mother's testimony that Uncle had driven Child to school on numerous occasions. The ALJ did not, apparently, consider Child's own statement that Uncle "used to drive me to school …. Sometimes. Not often often, [sic] but sometimes." R.R. 88a. Mother testified that she usually drove Child to school and that Father, who is a stay-at-home dad, drove when Mother could not.

It is the factfinder's job to make and explain credibility determinations when conducting the "weighing dynamic" required by 23 Pa. C.S. §6303(a). Further, in discharging that duty the factfinder must consider all the named

16

perpetrator's evidence that conflicts with the county's evidence. Because we conclude that the ALJ did not engage in this "weighing dynamic," we will vacate the adjudication and remand for this exercise. In doing so, the ALJ must eliminate use of a double standard to evaluate the evidence that affected his proposed adjudication and be mindful that it is the County, not Uncle, that bears the burden of proof.

In his discussion of the hearing evidence, the ALJ applied a double standard, one for the County and another for Uncle. For example, the ALJ dismissed Uncle's witnesses on grounds of bias. Four adults testified, under oath, on behalf of Uncle, and against Child, and they were all found incredible by the ALJ because of "bias." This is not an adequate explanation because these witnesses could just as easily, as family members, been biased in favor of Child. In any case, bias would also be a reason to dismiss the testimony of Father and Mother as incredible. The ALJ invoked his concept of familial "bias" against Uncle but not against the County.

Second, bias does not support the ALJ's dismissal of the testimony of Uncle's "mistress." Adjudication at 12. The ALJ found Girlfriend "not unbiased" because she was willing to date Uncle while he was married. *Id.* It is not clear how these two observations of the ALJ relate to each other. Further, Girlfriend had to take off time from work to testify and had nothing to gain or lose from testifying about a person she has not dated for many years, unless she was interested in the truth. Girlfriend may not be credible, but the ALJ's stated reason, "bias," lacks a foundation.

17

Third, the ALJ faulted Uncle for not calling Child's teachers and friends to testify about his reputation with respect to speaking truthfully. This is misplaced criticism because the County had the burden of proof. It could have called these witnesses. For Uncle to do so would require him to tell persons outside the family why he needed this testimony, thereby expanding the damage to his reputation. Uncle's witnesses, *i.e.*, his brothers, niece and mother, all testified that Child had a weak reputation for truthfulness. This testimony was not rebutted by the County. Not even Father and Mother testified in opposition to these witnesses. This is another instance of the ALJ's double standard.

Fourth, in evaluating Child's "clear" testimony, the ALJ glossed over his lapses in memory as mere "details" and the result of the passage of time. Child's inability to remember whether his encounters with Uncle included oral sex is more than a mere "detail." More to the point, this passage of time did not work to Uncle's advantage. The ALJ found Uncle's statement that he drove Child to school only two to three times, at odds with the higher estimate of Mother of Father, fatal to Uncle's credibility. The ALJ reasoned that Child's testimony was more likely credible because he risked the alienation of his family by making accusations against a popular uncle. The ALJ did not consider, however, that Child might experience alienation from his Mother and Father should he recant his accusation of Uncle.

Finally, the ALJ made no mention of the content of Cousin's testimony, only her reputational testimony. This is capricious disregard of evidence. Cousin described Child as her closest cousin. She expected him to defend himself against her charge that he was lying, but he did not do so. Cousin

18

expected Child to confide in her, but he simply incoherently "rambled." The ALJ must address Cousin's account about this incident and why it does not outweigh Child's testimony.

The statutory standard requires the factfinder to make a finding, whether in favor of the county or in favor of the alleged perpetrator, on the basis of

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a). The ALJ must undertake this weighing of the evidence with reference to demeanor and substance of the testimony and all other evidence to enable meaningful appellate review. A dismissal of one side's evidence with a conclusory credibility determination does not suffice.

## Conclusion

For these reasons, we vacate the Department's adjudication and remand for consideration of the record in accordance with the statutory standard.

_____
MARY HANNAH LEAVITT, Judge

Senior Judge Friedman concurs in the result only.

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

A.P.,                              :
           Petitioner             :    **SEALED CASE**
                                   :
       v.                          :    No. 1931 C.D. 2013
                                   :
Department of Public Welfare,      :
           Respondent             :

# **O R D E R**

AND NOW, this 21st day of August, 2014, the order of the Department of Public Welfare, dated September 25, 2013, in the above-captioned matter is hereby VACATED and this matter is REMANDED for further proceedings consistent with this opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, Judge