IN THE COMMONWEALTH COURT OF PENNSYLVANIA

A.N.P.,                                    :
                        Petitioner         :
                                           :    **CASE SEALED**
            v.                             :    No. 567 C.D. 2015
                                           :    Submitted:  August 28, 2015
Department of Human Services,              :
                        Respondent         :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge[1]
           HONORABLE MARY HANNAH LEAVITT, Judge[2]
           HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE LEAVITT                                        FILED: February 10, 2016


          A.N.P. (Uncle), *pro se*, petitions for review of an adjudication of the

Department of Human Services denying his request to expunge an indicated report,

which named him as a perpetrator of child abuse, from the ChildLine Registry.[3]

The Department's Bureau of Hearings and Appeals adopted, in its entirety, the

recommended adjudication of the Administrative Law Judge (ALJ), which was

---

[1] This matter was assigned to this panel on or before December 31, 2015, when President Judge
Pellegrini assumed the status of senior judge.

[2] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt
became President Judge.

[3] ChildLine is a unit of the Department that operates a statewide toll free system for receiving
and maintaining reports of suspected child abuse, along with making referrals for investigation.
55 Pa. Code §3490.4.  The ChildLine Registry is maintained in accordance with the Child
Protective Services Law, 23 Pa. C.S. §§6301-6386.

issued following a remand from this Court.[4]   The ALJ found, again, that the putative victim's testimony proved that Uncle had sexually abused his nephew (Child) in 2006, when Child was 13.   Uncle appeals, contending that the Department's finding of abuse is not supported by substantial evidence because Child's vague and conflicting testimony on such critical facts as his age at the time of the purported abuse did not outweigh the contrary evidence offered by Uncle, *inter alia*, that child had a reputation for lying and that Uncle, who adamantly denied the accusation, had a reputation for being a truthful person of high character.

Child, who was born in 1992, is the adopted son of Father and Mother.   In high school, Child developed a drug dependency and, in 2010, he entered an in-patient treatment facility.   While there, Child accused a male staff counselor of making a sexual advance.   In the course of the police investigation of this accusation, Child accused Uncle of sexually abusing him five years earlier.[5]

At the time of the alleged abuse, Uncle was married and the father of two children.   In the spring of 2005, Uncle began a relationship with another woman (Girlfriend), which prompted a separation from his wife.   In September 2005, he moved into the home of his brother, who is the father (Father) of Child.[6] Uncle travelled two weeks a month in connection with his job in finance, and he

---

[4] Because the case is now before this Court for a second time, we will include an abbreviated summary of the evidence presented.  For a full recitation, see *A.P. v. Department of Public Welfare*, 98 A.3d 736 (Pa. Cmwlth. 2014).

[5] Police investigated Child's accusation of Uncle, but they did not file criminal charges against Uncle.

[6] Father was a stay-at-home dad.  Child's maternal grandparents, Mother and younger brother also lived in the house.

spent many nights at the home of Girlfriend. Uncle's actual time spent at Father's home is uncertain.

In January of 2006, Uncle obtained partial custody of his son, age six, who stayed with Uncle on weekends at Father's home. In August 2006, Uncle moved into his own apartment, and in 2007 he reconciled with his wife.[7]

On June 9, 2010, the County Office of Children, Youth and Families (County) filed an indicated report of child abuse against Uncle. Uncle requested expungement of the indicated report, on which the ALJ conducted two days of hearings.

Child testified that the abuse took place in the basement recreation room that opened onto a patio and swimming pool. Child stated that one evening he let Uncle into the house when he arrived home from work late at night. The two watched a DVD entitled "When a Stranger Calls" in the recreation room and drank "Mike's Hard Lemonade," which contained alcohol. Notes of Testimony, 3/7/13, at 27 (N.T. ___). Child testified that while watching the DVD, Uncle touched Child's "crotchal area," first over his clothing and then under his clothing. N.T., 3/7/13, at 33. Then, at some point, Child's penis became exposed, *i.e.*, "out" although Child did not know "how that part came about." N.T., 3/7/13, at 35. Specifically, Child could not say if it was Uncle or Child who exposed Child's penis. *Id.* Uncle masturbated, but Child could not say which "of those two things happened first." *Id*. at 36. Child "guessed" that incidents like the first one occurred "[o]nce every other week" on average. *Id*. at 38. Child could offer no specific details about any of the other incidents, such as day of the week, hour of

---

[7] In 2010, they again separated and are now divorced.

the day, what he was wearing, what movies were playing or what, exactly, happened:

> A. As far as – just overall. That, you know – and I – the more comfortable I guess I became with, like, kind of just my – doing things to myself and –
>
> Q. When you were doing things to yourself, was [Uncle] doing anything?
>
> A. Yeah. Again, not every time. It was sometimes – he was mas-____ I didn't really look over too much.
>
> Q. Okay.
>
> A. Maybe. Most of the time – actually, I rarely ever did. So –
>
> Q. Did you ever see him doing anything?
>
> A. Well, like, if I'm – I see it, like, out of the corner of my eye but I – it's not necessarily that I always paid attention.
>
> Q. Okay. What did you see out of the corner of your eye?
>
> A. Well, like a motion. Like – like, the motion of masturbation. I – again, even at the time I don't know if I was cognizant of it. I don't know if I – remember happening and when I became cognizant of what that was, but now I – now I –
>
> Q. Was there ever any oral sex that occurred?
>
> A. Not that I remember.

N.T., 3/7/13, at 40.

On cross-examination, Child could not say when the first incident of this side-by-side masturbation took place. He stated that it took place after Uncle had been living with the family for a while but could not say if it was before or after Christmas. He could not recall whether he was wearing sweatpants, pajamas,

4

a t-shirt or sweatshirt.  Child testified that he did not see Uncle's penis and then expressed doubt about whether he saw Uncle masturbating, stating:

> I didn't see exactly what it was.  I know that it was a masturbation motion so it could have been, I guess, nothing.

N.T., 3/7/13, at 59.

Father testified that he believed Child.  However, he acknowledged that he told Uncle that he did not believe Child, when the accusation was first made.  N.T., 3/7/13, at 90, 93.

Girlfriend testified for Uncle that by the end of 2005, Uncle was spending most nights at her house.  After Uncle obtained partial custody of his son in January 2006, he virtually never spent the night at his brother's house without his son also being present.  She stated that because Uncle would not bring his son to her house, the couple had less time together, given Uncle's travel.  The relationship ended, and they have not dated in over six years.

Child's cousin (Cousin) testified that Child has a reputation for lying.  Cousin also testified of her fondness for Child and described their relationship as a close one.  She described an incident that took place in the summer of 2010 when, at his request, she drove Child to a meeting with his probation officer.  Cousin raised the issue of Child's accusation of Uncle's abuse, expecting him to confirm the accusation.  To her surprise, he did not do so.  Cousin described Child's response as follows:

> Q.  And what was his reaction?
>
> A.  He put his head in his hands kind of, and he kind of slouched over and he just started rambling.  And all I remember is that *he did not say that it happened*.  Through all the rambling, he did not come out and tell me that it happened.  And as close as we were growing up and

5

everything it was – *I was expecting him to confide in me and tell me if it happened*. I mean, I was basically accusing him – I was basically telling him like, these lies you're telling – do you know what you're doing to our family? *That was his chance to tell me it happened. I'm telling you it happened. And he did not do that at all*.

N.T., 3/7/13, at 116 (emphasis added).

Uncle's mother and his other brothers all attested to Uncle's moral character and high reputation for truthfulness. They confirmed Cousin's claim that Child had a reputation for lying.

For his part, Uncle adamantly denied Child's accusation of abuse.[8] He denied that he had ever watched a movie alone with Child, in any room, or that

---

[8] Uncle denied every aspect of Child's accusation. He testified as follows:

Q. Do you ever remember in a time frame watching a movie alone with [Child] while you were living at your brother's home?

A. No, I never watched a movie alone with [Child].

Q. Did you ever give him any alcohol?

A. No, never.

Q. And did you ever -- the bedroom that was downstairs [in the basement], there's a separate door to that bedroom I think you said?

A. Yes. There was a door on that bedroom.

Q. Did you ever bring him into that bedroom?

A. No.

Q. Do you ever recall -- and I know we have to go back a ways here -- did you ever recall a single time when you were alone -- and by "alone" I mean no parents home in that house -- with either [Child or his brother] or both?

A. No, I was never alone with those children. There was always somebody at that house when I was at that house.

N.T., 4/11/13, at 36-37.

Q. [Y]ou've heard your nephew testify about these things he's claiming happened down in that basement?

A. Yes.

**(Footnote continued on the next page . . .)**

6

he had ever given Child alcohol. He denied that Child ever let him into the house late at night. Uncle testified that he spent nights at Girlfriend's home between September 2005 and January 2006 because it was closer to his job and to his marital residence, which allowed him to help his wife with the two children. In January 2006, Uncle obtained partial custody of his six-year-old son, who spent every other weekend at Father's home with Uncle. Uncle testified that other than those weekends, he could recall staying at Father's home only a few nights a month after January 2006. Uncle testified that he went on business trips twice a month, and each trip lasted three to four days. He presented his paper calendar from that period, which documented his busy schedule, including out-of-town travel and visits with his children. Uncle moved into his own apartment on August 12, 2006.

Uncle described learning of Child's accusation in a phone call from Father while Uncle was on a business trip to Chicago:

> He said, "you know, [Child's] in [name of drug treatment facility]." And he said – told me what [Child] had said. *"[Child] said that you touched him and you masturbated in front of him."* And, you know, I was shocked. I was repulsed by it.
>
> And, you know, I said, "[Father's name] I never did any of those things."

---

**(continued . . .)**

> Q. Inappropriately touching him, masturbation, things of that nature. Did you do anything of those things that he described?
> A. No, I have not. These allegations are hideous. You'd have to be a monster to do that. And I know people in this room aren't going to get to know me in one day. But I am not a monster, and I've waited three years [to] say under oath that I never did those things to him.

N.T., 4/11/13, at 50.

And he said back to me, he said, "I know. [Child] is a bit – a habitual liar." He said, "He engages in different types of lying. I believe you 98 percent, but because he's my son," he's saying, "yet I got to believe him 2 percent."

N.T., 4/11/13, at 45 (emphasis added).

Uncle testified about the negative effect the indicated report has had on his life. His visits with his children are limited and supervised; he cannot coach his children in sports leagues; he cannot apply for a job for fear of a background check; he is treated differently by school personnel; and he is afraid to be near any children for fear of being falsely accused of something.

The County then called Father and Mother to address several of Uncle's statements, such as his denial that Child ever let Uncle into the house late at night; how many nights Uncle spent at their house; and how often Uncle drove Child to school. Mother testified that Uncle spent approximately 20 or 25 days a month at their home and "often" took Child to school. Father acknowledged that when he called Uncle about Child's allegations, he believed Uncle's denial. N.T., 4/11/13, at 83.

The ALJ found Child's testimony "very credible" and sufficiently clear and detailed to meet the clear and convincing standard of proof. He found that the abuse began in May of 2006[9] and ended when Uncle moved out in August 2006. The ALJ also found Father and Mother credible. The ALJ rejected Uncle's testimony. Uncle's paper calendar showed a busy travel schedule, but the ALJ rejected it as not probative because it could have been altered. The ALJ likewise dismissed the value of a photograph from this time period showing Uncle and

---

[9] The parties stipulated that the DVD release date for the movie "When a Stranger Calls" was May 16, 2006, which was the earliest possible date for the first incident. N.T., 4/11/13, at 37.

Child together at a family function looking relaxed and happy. Finally, the ALJ rejected the testimony of Uncle's other witnesses for the stated reason that, as family members, they were biased in his favor. The Department's Bureau of Hearings and Appeals adopted the ALJ's recommended adjudication that Uncle's request for expunction be denied.

Uncle appealed and this Court vacated and remanded for further consideration of the evidence. *See A.P. v. Department of Public Welfare*, 98 A.3d 736 (Pa. Cmwlth. 2014) (*A.P. I.*).[10] The ALJ employed the clear and convincing evidence standard, which standard was later rejected by our Supreme Court in *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014). The standard governing expunction hearings announced by the Supreme Court in *G.V.* is "preponderance of the evidence" as provided for in Section 6303(a) of the Child Protective Services Law. *A.P. I.*, 98 A.3d at 742.

Section 6303(a) instructs that the standard for evidence presented in an expunction hearing is

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a). We explained in *A.P. I.* that this statutory standard incorporates a "weighing dynamic" that goes beyond a traditional deferential substantial evidence review. *A.P. I.*, 98 A.3d at 742-43.[11] In order for the

---

[10] When this case began, the agency was known as the Department of Public Welfare. In November 2014, the Department of Public Welfare became the Department of Human Services. *See* Act of September 24, 2014, P.L. 2458, 62 P.S. §103 (effective November 24, 2014).

[11] In *G.V.*, 91 A.3d 667, our Supreme Court held that Section 6303(a) of the Child Protective Services Law, 23 Pa. C.S. §6303(a), governs the standard of proof in expunction hearings. In his concurring opinion, Justice Baer explained that the statutory standard is the "well-known civil **(Footnote continued on the next page . . .)**

9

Department to maintain an indicated report of abuse, the evidence of abuse must outweigh contrary evidence. *Id.*[12]

In *A.P. I.*, we concluded that the ALJ had not undertaken this weighing dynamic. The ALJ did not consider all the evidence in conflict with Child's statement or explain his credibility determinations. Specifically, the ALJ capriciously disregarded Cousin's testimony that she expected Child to confide in her and strenuously affirm his abuse claims, but he did not do so. *A.P. I.*, 98 A.3d at 745. Further, the ALJ had employed an impermissible double standard when assessing the evidence, in the following ways: (1) the ALJ rejected Uncle's witnesses because of a perceived familial bias but did not invoke the concept of

---

**(continued . . .)**

standard of preponderance of the evidence." *Id.* at 679 (Baer, J., concurring). In a second concurring opinion, now Chief Justice Saylor agreed with Justice Baer on this point and cautioned against conflating the statutory standard at 23 Pa. C.S. §6303(a) with the "substantial evidence standard prevailing on appellate review under Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704." *Id.* at 674 (Saylor, J., concurring). He explained the material difference. The statutory standard incorporates a "weighing dynamic." *Id.* By contrast, "[t]raditional appellate substantial-evidence review ... omits all such weighing – instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *Id.*

[12] In contrast, for testimony to constitute clear and convincing evidence, which is the highest burden in civil law, the witnesses must be found credible and the facts to which they have testified must be "remembered distinctly," and their testimony must be "so clear, direct, weighty and convincing as to enable" the trier of fact "to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *T.T. v. Department of Public Welfare*, 48 A.3d 562, 567 (Pa. Cmwlth. 2012), *vacated and remanded on other grounds sub nom. T.L.T. v. Department of Public Welfare*, 101 A.3d 1148 (Pa. 2014). In his first adjudication, the ALJ found Child's testimony to be "remembered distinctly," which allowed the ALJ to reach a "clear conviction, without hesitancy" of the truth of Child's accusation. The ALJ misapplied the clear and convincing standard of proof. First, Child's account was not marked by his distinct memory; he did not know if the incidents included oral sex. Second, one cannot accept, "without hesitancy," the statement of a "habitual liar" as true.

familial bias against Father and Mother; (2) the ALJ rejected Girlfriend's testimony as biased even though Girlfriend and Uncle had not dated for six years; (3) the ALJ criticized Uncle for not calling Child's teachers or friends to testify about Child's reputation but it was the County, not Uncle, that had the burden of proof; (4) Father and Mother did not rebut the testimony of family members that Child was not truthful; (5) the ALJ found Child's testimony to be "clear" despite deficiencies and lapses in memory, which the ALJ chalked up to the passage of time and, at the same time found Uncle's inability to remember details fatal to his credibility; and (6) the ALJ reasoned that Child was credible because he risked alienation from family members by making accusations against a popular uncle but did not consider that Child might experience alienation from Mother and Father if he were to recant his accusations. *Id*. at 744-45.

Because of these deficiencies, we vacated and remanded for consideration of the record in accordance with the statutory weighing dynamic standard, instructing the ALJ to

> undertake this weighing of the evidence with reference to demeanor and substance of the testimony and all other evidence to enable meaningful appellate review. A dismissal of one side's evidence with a conclusory credibility determination does not suffice.

*A.P. I.*, 98 A.3d at 745.

On remand, the ALJ concluded that the County met its burden of proving that the indicated report should stand because of Child's "clear and credible" statements that Uncle had sexually abused him. ALJ Recommended Adjudication at 15. Acknowledging that Child's testimony was the County's only evidence of abuse, the ALJ concluded that Child's "testimony is of the quality that

11

it outweighs inconsistent evidence." ALJ Recommended Adjudication at 10. The Department's Bureau of Hearings and Appeals again adopted, in its entirety, the ALJ's recommended adjudication. Uncle petitioned for this Court's review.[13]

On appeal, Uncle argues that the Department erred. He contends that the evidence weighs in his favor and against Child's vague, rambling and conflicting testimony. Thus, it does not satisfy the statutory definition of substantial evidence of child abuse. Further, the ALJ again capriciously disregarded Cousin's testimony despite this Court's instruction to discuss and render findings on that testimony, and again employed an impermissible double standard in evaluating the evidence.

In an expungement hearing, the county agency bears the burden of proving that the actions of the alleged perpetrator constitute child abuse within the meaning of the statute. *B.J.K. v. Department of Public Welfare*, 773 A.2d 1271, 1275 (Pa. Cmwlth. 2001). As discussed *supra*, Section 6303(a) of the Child Protective Services Law defines "substantial evidence" as

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

_____

[13] Our review determines whether constitutional rights were violated, whether errors of law were committed or whether necessary findings of fact are supported by substantial evidence. *J.M. v. Department of Public Welfare*, 94 A.3d 1095, 1098 n.8 (Pa. Cmwlth. 2014). In addition, review for capricious disregard of material, competent evidence is an appropriate component of appellate consideration in every case in which such question is properly brought before the court. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002). Capricious disregard of the evidence exists "when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Station Square Gaming L.P. v. Pennsylvania Gaming Control Board*, 927 A.2d 232, 237 (Pa. 2007).

12

23 Pa. C.S. §6303(a). To meet this statutory burden of proof, the county must submit evidence of abuse that outweighs contrary evidence. *A.P. I.*, 98 A.3d at 742-43.

The accuracy of an indicated report turns, in large part, on the credibility of testimonial evidence. *R. v. Department of Public Welfare*, 636 A.2d 142, 144-45 (Pa. 1994). A child's testimony alone, even if uncorroborated, can constitute "substantial evidence to support an indicated report of child abuse." *D.T. v. Department of Public Welfare*, 873 A.2d 850, 854 (Pa. Cmwlth. 2005). However, to meet the statutory standard, the child's "testimony must be of such a quality" to allow the factfinder to conclude that it outweighs inconsistent evidence. *In re: S.H.*, 96 A.3d 448, 462 (Pa. Cmwlth. 2014) (holding that where there is no physical evidence of abuse all of the child's testimony must be considered, not just selective parts).

It is axiomatic that the Department is the factfinder in expungement appeals and responsible for credibility determinations. *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). Nevertheless, whether evidence meets a prescribed standard of proof is "always a question of law and therefore reviewable by the appellate court." *Stafford v. Reed*, 70 A.2d 345, 346 (Pa. 1950).

Uncle argues that the County's evidence, consisting solely of Child's testimony, lacked the quality required by the statutory definition of substantial evidence. First, the ALJ disregarded the many discrepancies in Child's testimony. Second, the ALJ disregarded the evidence that contradicted Child's testimony. Third, the ALJ used a double standard in evaluating Uncle's evidence, *i.e.*, familial bias, that this Court rejected in *A.P. I.* Uncle asserts that for these reasons the

Department's determination must be set aside. We agree and, thus, vacate and remand for further findings.

Child was 13 years old when the alleged abuse occurred and 20 years old when he testified before the ALJ. His accounts of the abuse varied. Child told juvenile probation officers that he was 11 years old when the first incident occurred. Child chalked up the two-year discrepancy to his "never [being] sure about the time frame." N.T., 3/7/13, at 70. Child told police that Uncle had exposed himself and 30 to 40 incidents of abuse occurred over a six to seven month period. Before the ALJ, Child testified that he did not see Uncle's penis and that the incidents happened sporadically, "guessing" about once every other week. Child testified that he did not know when the first incident occurred or whether the second alleged incident occurred a week or a month after the first. Child stated that the other incidents were like the first but could offer no details about any of the other incidents. N.T., 3/7/13, at 65. Child testified that he believed Uncle was "sometimes" masturbating during the incidents, but "not every time." N.T., 3/7/13, at 40. Child testified that he saw a "masturbation motion" out of the corner of his eye, but he was unsure, noting "it could have been, I guess, nothing." N.T., 3/7/13, at 59. Child explained his uncertainty as follows: "it's not necessarily that I always paid attention" to Uncle during the incidents. N.T., 3/7/13, at 40.

The ALJ credited Child's testimony as being "clear and consistent" and established "several incidents of sexual conduct between [Uncle] and the subject child between the approximate months of May 2006 to August 2006." ALJ Recommended Adjudication at 5; Finding of Fact No. 8. The ALJ explained why he credited Child's testimony as follows:

> As the finder of fact, I personally observed the subject child's demeanor and carefully listened to his testimony during the

14

hearing and found it very credible. As the finder of fact, I find his demeanor and the statements he made came across as candid, unrehearsed, and sincere. As the finder of fact, I find he was clear and consistent upon both direct and cross examination. As the finder of fact, I find he gave me no reason to doubt the truthfulness of his testimony.

ALJ Recommended Adjudication at 11. The ALJ found that Child's memory lapses made him more credible, stating:

The subject child's willingness to admit that he simply did not remember or did not know the answers to several questions, rather than embellish or come across as overly rehearsed, also bolstered his credibility in my mind.

*Id.* The ALJ excused the discrepancies in Child's various accounts as "minor" and attributable to the passage of years between the alleged abuse in 2006 and Child's report of it in 2010. The ALJ stated as follows:

Moreover, whether the incidents of abuse occurred 30-40 times over a period of 6-7 months or 10-20 times over a period of 4-5 months, in my mind, does not affect the credibility of the subject child, nor does it completely contradict any of his prior testimony. The numbers the subject child gave in his police statement were estimates and those estimates still fall within the time frame when [Uncle] stayed with the subject child. The movie the subject child states they were watching when the first incident occurred also falls within that same time frame. *Any inconsistencies between the numbers are not glaring, but minor, and should be expected when reporting events that occurred several years prior.*

ALJ Recommended Adjudication at 14 (emphasis added). The ALJ credited Father and Mother's testimony and, thus, found that Uncle was present at the home and drove Child to school more often than he claimed. In fact, the ALJ found that Uncle's statement that he drove Child to school no more than three times "undermined [Uncle's] credibility the most." ALJ Recommended Adjudication at

15

13. The ALJ also noted that Uncle's paper calendar showed "he was in town enough nights for multiple incidents to have occurred." ALJ Recommended Adjudication at 13.[14]

> The ALJ rejected Uncle's testimony, explaining:
>
> I personally observed [Uncle's] demeanor and carefully listened to his testimony during the hearing, making mental note of the inflections in his voice and mannerisms. However, contrary to the subject child, I did not find [Uncle] credible. As the finder of fact, I found his testimony came across as unreliable and insincere. In addition, I also find [Uncle] was unsuccessful in discrediting the testimony of the subject child.

ALJ Recommended Adjudication at 12.

The ALJ found Girlfriend's testimony not credible. While acknowledging that Girlfriend and Uncle had not dated in several years, the ALJ found that Girlfriend was not a "neutral witness" because it appeared to the ALJ that Girlfriend and Uncle still cared for each other. ALJ Recommended Adjudication at 13.

With respect to the testimony from several family members that Child has a reputation for untruthfulness, the ALJ was "not convinced it was true." ALJ Recommended Adjudication at 15. Acknowledging that no one knows a person better than his family, the ALJ noted that Child's parents and brother did not testify that he had a reputation for lying. The ALJ also found it significant that Uncle did not present Child's friends, classmates or teachers to testify about his truthfulness.

These credibility determinations and findings are problematic because the ALJ again used a double standard when assessing the evidence. First,

---

[14] Uncle states that he was at his brother's home for 35 weekdays from mid-May 2006 until he moved out. Uncle's Brief at 26-27.

the ALJ found that deficiencies in Child's testimony and his inability to remember key information actually made him more credible; by contrast, Uncle's inability to remember details, such as his statement that he drove Child to school three times at most, was deemed fatal to his credibility. On the other hand, Father's statement that Uncle moved out in September or October, when it was actually August 12th, did not adversely affect Father's credibility.

Second, the ALJ again deemed Uncle's witnesses biased but assumed that Child's parents and brother would have testified in an unbiased manner about their belief of Child. However, just as Uncle's witnesses care for him, presumably Child's parents care for him as well. The ALJ did not acknowledge the fact that Child's parents did not testify that Child was known to be truthful. In fact, Father testified that he believed Uncle when Child initially made the allegations against him. Uncle testified that when he denied abusing Child, Father replied that he believed Uncle 98 percent because Child is a "habitual liar," but that he had to believe Child two percent because Child is his son. N.T., 4/11/13, at 45. Father testified after Uncle on rebuttal but did not deny the substance of this conversation with Uncle.[15]

Third, the ALJ faulted Uncle for not presenting testimony from Child's friends, classmates or teachers about his truthfulness. There was abundant evidence offered by Child's family members about his reputation. As this Court explained in *A.P. I.*,

> the County had the burden of proof. It could have called these witnesses. For Uncle to do so would require him to tell persons

---

[15] Uncle argues that the testimony about Child's lying "casts serious doubt upon [Child's] ability or willingness to testify accurately." Uncle's Brief at 27.

outside the family why he needed this testimony, thereby expanding the damage to his reputation.

*A.P. I.*, 98 A.3d at 744-45. The ALJ erred by again faulting Uncle for not presenting witnesses from outside the family.

Besides using the double standard, the ALJ committed an additional error. In *A.P. I.*, this Court held that the ALJ had capriciously disregarded the testimony of Cousin, who testified that she confronted Child, expecting him to confirm the abuse, but he did not. We instructed the ALJ to "address Cousin's account about this incident and why it does not outweigh Child's testimony." *Id.* at 745. On remand, however, the ALJ once again ignored Cousin's testimony. Cousin's testimony goes beyond reputation. Cousin was the only witness to testify that she spoke privately to Child about his allegations against Uncle and received a "rambled" response but not a confirmation of the abuse. Notably, Child did not rebut Cousin's account of this incident.

The ALJ glossed over the deficiencies in Child's testimony. Because there is no physical or any other corroborating evidence of sexual abuse, Child's testimony must "be of such a quality" to allow the factfinder to conclude that it outweighs inconsistent evidence. *In re: S.H.*, 96 A.3d at 462. In assessing Child's testimony, the ALJ must consider all of Child's testimony, not only the selective parts that described abuse. *Id.* at 462.

The ALJ found that "several incidents of sexual conduct" between Uncle and Child took place between May and August 2006. ALJ Recommended Adjudication at 5; Finding of Fact No. 8. The ALJ selected that time-frame because the movie "When a Stranger Calls," which was the only clear detail in Child's description of the first incident, was not released on DVD until May 16, 2006. Uncle testified that he moved into his own apartment on August 12, 2006, a

18

date confirmed by his personal financial records. Contrary to the ALJ's finding that this time-frame encompassed four to five months, it actually spans less than three months. The ALJ's time frame also assumes that Uncle purchased and played the DVD on the release date, which seems unlikely. (Uncle denies ever watching the DVD).

Child's account of how many incidents of abuse occurred is even less clear. Child told police there were 30 to 40 incidents over six or seven months and testified before the ALJ that the incidents were sporadic and averaged one every other week. The ALJ acknowledged that there could not have been 30 to 40 incidents between May and August but concluded there could have been 10 to 20. The ALJ excused the discrepancy between 10 to 20 and "30 to 40" as "not glaring, but minor," and attributable to the effect of the passage of time on Child's memory. ALJ Recommended Adjudication at 14. An average of one incident every other week for the three-month period would equal seven or eight incidents, not 10 to 20 and certainly not 30 to 40. This discrepancy is not a minor one.

The ALJ ultimately concluded that the County proved the facts in the indicated report because Uncle "was in town enough nights for multiple incidents to have occurred" and because the movie Child reported watching during the first incident and his "estimates" of the other incidents "fall within [ ] the time frame when [Uncle] stayed with the subject child." ALJ Recommended Adjudication at 13, 14. It is difficult to imagine a scenario where anyone could successfully rebut allegations of sexual abuse made by an individual with a reputation for untruthfulness when the factfinder finds the accuser's vague testimony definitive by excusing its discrepancies and omissions as attributable to the passage of time.

19

Although the testimony of an accuser, alone, can be sufficient to prove that an indicated report of child abuse is accurate, the ALJ must consider and address *all* relevant evidence in determining whether Child's testimony is adequate to outweigh the contrary evidence presented in this case, and explain the rationale for the decision. The ALJ must determine whether the County met its statutory burden of proof without use of a double standard when assessing the evidence.[16]

Accordingly, we vacate the Department's order and remand for a new adjudication in accordance with the foregoing opinion.

_____
MARY HANNAH LEAVITT, Judge

---

[16] The Child Protective Services Law was amended effective December 31, 2014, to provide another avenue to challenge a listing on the ChildLine Registry "at any time." The statute now provides, in relevant part:

> *At any time, the secretary may amend or expunge any record in the Statewide database under this chapter upon good cause shown* and notice to the appropriate subjects of the report. The request shall be in writing in a manner prescribed by the department. For purposes of this paragraph, good cause shall include, but is not limited to, the following:
>> (i) Newly discovered evidence that an indicated report of child abuse is inaccurate or is being maintained in a manner inconsistent with this chapter.
>> (ii) A determination that the perpetrator in an indicated report of abuse no longer represents a risk of child abuse and that no significant public purpose would be served by the continued listing of the person as a perpetrator in the Statewide database.

23 Pa. C.S. §6341(a)(1) (emphasis added).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

A.N.P.,                        :
          Petitioner        :
                        : **CASE SEALED**
    v.                      : No. 567 C.D. 2015
                        :
Department of Human Services,  :
          Respondent    :

## ORDER

AND NOW, this 10th day of February, 2016, the order of the Department of Human Services, dated January 28, 2015, in the above-captioned matter is hereby VACATED, and the matter is REMANDED for further findings and conclusions in accordance with the attached opinion.

      Jurisdiction relinquished.

 

_____
MARY HANNAH LEAVITT, Judge