IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M.L.,                              :
             Petitioner           :
                                  :    **CASE SEALED**
         v.                       :    No. 2356 C.D. 2015
                                  :    Submitted: June 10, 2016
Department of Human Services,     :
             Respondent           :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE DAN PELLEGRINI, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY PRESIDENT JUDGE LEAVITT                    FILED: March 6, 2017

         M.L. (Father) petitions for review of an adjudication of the
Department of Human Services (Department) denying his request to expunge an
indicated report of sexual abuse of his daughter, L.S. (Child), from the ChildLine
Registry.[1]  Child was four years old at the time of the alleged abuse and seven
when she testified.  The Department's Bureau of Hearings and Appeals (Bureau)
adopted, in its entirety, the recommended adjudication of the Administrative Law
Judge (ALJ).  The ALJ found that Child's testimony, unsupported by physical
evidence, proved that Father had committed acts of digital penetration on one or
two occasions.  Father has appealed, contending that the ALJ's finding of abuse is

---

[1] ChildLine is a unit of the Department that operates a statewide toll free system for receiving
and maintaining reports of suspected child abuse, along with making referrals for investigation.
55 Pa. Code §3490.4.  The ChildLine Registry is maintained in accordance with the Child
Protective Services Law, 23 Pa. C.S. §§6301-6386.

not supported by substantial evidence, as that term is defined in the applicable statute. We vacate and remand.

## Background

Child, who was born on May 20, 2007, lives with her mother, K.S. (Mother), and her maternal grandmother (Grandmother). In May 2009, Father, who shares legal custody with Mother, obtained greater visitation rights. His twice monthly weekend custody began Thursday at 5:00 p.m. and continued through Sunday at 6:00 p.m. He also had Child between 4:30 p.m. and 8:00 p.m. on alternating Mondays and Wednesdays.

On December 20, 2011, Children and Youth Services (CYS) filed an indicated report (2011 report) with the Department that named Father as a perpetrator of child sexual abuse. The indicated report specified that "due to [Child] making disclosure of penetration and of it hurting … case meets the criteria for child abuse…." Certified Record (C.R.) Exhibit C-4. Father appealed and requested a hearing. In September 2012, CYS filed a second indicated report (2012 report) with the Department, again stating that Father had digitally penetrated Child and, in addition, had exposed her to pornography. Father appealed the 2012 report and requested a hearing.

On May 27, 2014, the ALJ conducted a hearing on both indicated reports.[2] On behalf of CYS, Child testified, as did Mother, a counselor, a forensic interviewer, and a former CYS intake caseworker. Father, represented by counsel, testified in opposition to CYS' case.

---

[2] By the time of the hearing, Child was seven years old; she was four years old when the abuse was alleged to have occurred. The ALJ inquired into Child's ability to testify and concluded that Child had the capacity to testify truthfully.

2

At the hearing before the ALJ, Child testified that she was seven years old and in kindergarten. She lives with Mother and Grandmother. She stated that Father had hurt her by "putting his finger inside [her] pee-pee and [her] boompty [sic]." Notes of Testimony, 5/27/2014, at 17 (N.T. at __); Reproduced Record at 114a (R.R. __). Child stated that after using the toilet, she needed help wiping herself. Instead of helping her, Father hurt her by putting one finger inside her "pee-pee." N.T. at 20-21; R.R. 114a-115a. When she cried, Father locked her in the bedroom without food or anything to drink. Child testified that Father had touched her this way "once or twice" when she was four years old. N.T. at 25, 30; R.R. 116a, 117a.

On cross-examination, Child stated that she did not remember anyone else being at Father's house when she was there. N.T. at 35; R.R. 118a. Also, she did not recognize the name of her Father's sister (Aunt). *Id.* Finally, Child could not remember having practiced her testimony with Mother before a January 2013 habeas corpus proceeding, where she described Father's acts of digital penetration. *Id.* at 38-39; R.R. 119a.

Mother testified that, on November 16, 2011, while she, Child and Grandmother were decorating the Christmas tree, Child told them that her "pee-pee [was] hurting really, really bad." N.T. at 50; R.R. 122a. Child said that Father had touched her. Mother asked Child to demonstrate what happened, and Child pulled her underpants down, spread her legs apart, put her finger inside her vagina and said that Father was pinching her in her hole. Mother recalled that Child said, "Mommy, he didn't clean me. He put his finger inside my pee-pee, and it felt like pinching; [] it hurt really, really bad, and I was crying…." N.T. at 52; R.R. 122a. She asked Child why she had not said something before, and Child replied, "Well,

I didn't know if what [Father] was doing was right or wrong." N.T. at 53; R.R. 123a. Prior to this account, Mother had observed Child on all fours rocking back and forth in what looked like a sexual motion to Mother.[3] She also recalled that Child would ask her questions, like "What happens if you jab soap in your pee-pee?" and "what happens if you jab a doll up your pee-pee?" N.T. at 57-58; R.R. 124a. Finally, Mother testified that Child told her that Father would rub her chest, which Child did not like.

A child and family counselor (Counselor) testified that she began working with Child in January 2012, seeing her once a week for anxiety and aggressive behavior. During one counseling session, Child told her that her dad hurt her pee-pee, and it scared her. Mother had previously advised Counselor that Child was the victim of sexual abuse.

A former forensic interviewer (Interviewer) testified about her December 2011 interview of Child, which was done as a result of the November 18, 2011, report of abuse to CYS.[4] Interviewer prepared a report of her interview of Child, in which she wrote:

> [Child] reported she was brought [here] because, "[she] go[es] visiting and well … [Father] hurts [her.]" [Child] reported [Father] is mean and takes [her] away from [Mother]…. [Child] reported [Father] touches her "pee-pee" on the inside. [Child] reported her clothes are off when this happens. [Child] reported this happened after she had got a bath. [Child] reported [Father] said he was cleaning her "pee-pee," [b]ut he wasn't, he was hurting [her]." [Child] reported she is laying down when this happens. [Child] reported [Father] uses his

---

[3] Mother testified that Grandmother told her that on one occasion, Child got on all fours above Grandmother, who was lying on the sofa, and rocked back and forth.

[4] It is not clear who made the report, Mother or Child's pediatrician.

hand when he does this…. [Child] reported that she goes on visits with [Father] because he thinks she likes it, "but [she doesn't]…."

C.R. Exhibit C-2 at 1-2. On August 31, 2012, Interviewer again interviewed Child. This interview report stated as follows:

> [Child] reported her dad put his finger in her "pee-pee" and "poopy." [Child] reported her dad moves his finger around in a circle with both hands at the same time. [Child] reported it feels like "pinching." [Child] reported her dad took her clothes off. [Child] reported this happens in different rooms in her dad's home. [Child] reported her dad's clothes are off during the incidents. [Child] reported she can see her dad's private parts during the incidents, but does not remember what they look like…. [Child] reported her dad says he is cleaning her when he does this. [Child] reported her dad did not clean her, "He hurt [her]"….[Child] reported an incident when she was in the shower and her dad put his finger inside of her "pee-pee." [Child] reported her dad used his pointer finger to do this. [Child] reported she tells her dad to stop, but "he [doesn't]." [Child] reported this to have occurred more than one time. [Child] reported her dad has shown her "bad movies." When asked what "bad movies" are, [Child] stated, "sex"….

C.R. Exhibit C-3 at 1-2.

On cross-examination, Interviewer stated that she did not know that Mother had filed a protection from abuse petition against Father on November 18, 2011, before her first interview of Child. Further, at the time of her December 20, 2011, interview of Child,[5] she did not know how long Child had been in the exclusive custody of Mother.

_____

[5] It is unclear from the record the actual date Interviewer interviewed Child. Interviewer's report indicates an interview date of December 20, 2011, and she testified that she interviewed Child on this date. However, on cross-examination, Interviewer explained that, in her report, "DOS"
**(Footnote continued on the next page . . . )**

5

Lastly, CYS offered the testimony of a caseworker for CYS (Caseworker) who investigated the 2011 and 2012 claims that Father had abused Child. Because Caseworker believed Child, CYS issued the 2011 and 2012 indicated reports.

Father testified in response. He reported on the strained nature of his relationship with Mother that began before Child was born. He was not able to see Child until July 2007 and only after he petitioned the court and obtained a paternity test. In May 2009, Father received increased visitation with Child, seeing her every other weekend and alternating Mondays and Wednesdays.

Father testified that he did all the transportation for his visits with Child. For weekday visits, Father took child to the home of his sister (Aunt), who lives closer to Mother than he does. Aunt was also present for the weekend visits. In late August of 2011, he took Child on a vacation to South Carolina with Aunt and other members of his family. Father testified that Child never objected to visiting him. To the contrary, Child sometimes asked to stay with him or teared up because she did not want to return to Mother. Child called him "Daddy" or "Dad."

Father categorically denied that he ever inserted a finger into Child, anywhere for any reason. He denied laying Child on the floor so that he could wipe her bottom. He acknowledged that, because of her age, Child sometimes needed help wiping after she used the toilet. He denied ever exposing child to pornography. As a result of the indicated reports, Father has not been able to see

___

**(continued . . . )**
refers to Date of Service, which is the date Child was interviewed. Her report indicates the Date of Service was December 15, 2011. The ALJ found that the forensic interview was conducted on December 20, 2011; accordingly, that is the date that the interview occurred. ALJ Recommended Adjudication at 34; Finding of Fact No. 22.

Child in over three years and has had to stop his longtime volunteer activity as a Boy Scout leader.

The remainder of Father's evidence consisted of transcripts and documents from other proceedings. He contended that they refuted Child's accusations.

First, Father offered a copy of the transcript from a January 2013 habeas corpus proceeding, which showed that Mother had coached Child. At the hearing, Child testified:

> [Attorney:] Did [Mother] or your [grandmother] talk to you about what you are going to say today?
>
> [Child:] Yeah. I told her and she repeated and then we keep taking turns saying it.
>
> [Attorney:] You kept taking turns saying what you were going to say today?
>
> [Child:] Yeah.
>
> [Attorney:] Right. How many times do you think you kept taking turns saying what you were going to say today?
>
> [Child:] Like five or six times.
>
> [Attorney:] Did you do this this morning?
>
> [Child:] Um, yeah.
>
> [Attorney:] You did it today; right?
>
> [Child:] Yeah.
>
> [Attorney:] To make sure you remembered everything; right?
>
> [Child:] Uh-huh.
>
> [Attorney:] Is that right?

[Child:]     Uh-huh.

[Attorney:]  You have to say yes or no.

[Child:]     Yeah.

[Attorney:]  Did you do it last night before you went to bed?

[Child:]     Yeah.

C.R. Exhibit A-1 at 72-73.

Second, Father offered Mother's petition for a protection from abuse order, which offered a different account of the alleged abuse. The petition stated that Child told Mother that the alleged abuse occurred in a room "with the two turning chairs and big T.V.," she didn't have any pants on, and that Father "pinched her down there in her 'hole.'" C.R. Exhibit A-2 at 6.

Third, Father offered reports from Child's pediatrician from 2011 and 2012. They showed that Child's complaints of pain in her genital area long preceded the November 2011 accusation of digital penetration. Likewise, they continued to be made long after Father was prohibited from seeing Child.

Finally, Father offered the January 2014 District Attorney's Application for *Nolle Prosequi* of the criminal charges pending against Father citing "[a]n inability to successfully prosecute this matter due to the minor victim[']s young age." C.R. Exhibit A-9. The Court of Common Pleas granted the motion and the criminal charges were *nolle* prossed. C.R. Exhibit A-10.

CYS did not present any evidence or witnesses in rebuttal to Father's testimony or to any of his documentary evidence.

The ALJ issued a recommended adjudication.

With respect to the 2012 report, the ALJ recommended that Father's appeal be sustained because CYS offered no testimony to support the claim that

8

Father had Child watch pornography.  Child did not state to anyone other than Interviewer that Father had her watch pornography, and Father categorically denied that claim.  Neither Mother nor Child testified that Father exposed Child to pornography, let alone where or when.  The ALJ recommended that the 2012 report be expunged.

With respect to the 2011 report, the ALJ made the following relevant findings of fact:

> 11.  [Father] hurt [Child] by "putting his fingers inside [her] pee-pee and [her] bompty [sic]."  (N.T. 17).
>
> 12.  [Father] told [Child] he was going to clean her in the bathroom after she pooped and "instead of cleaning [her], he hurt [her]."  (N.T. 18)
>
> 13.  [Father] put his finger inside [Child's] "pee-pee and [her] bompty [sic] while on the floor in the bathroom."  (N.T. 19)
>
> 14.  [Child] pointed to her crotch when asked where her "pee-pee" was located.  (N.T. 20).
>
> 15.  [Father] put one finger in her "pee-pee" and it hurt.  (N.T. 20-22)
>
> 16.  [Child's] pants were down at the time of the incident and she cried.  (N.T. 21-23)
>
> 17.  The alleged abuse occurred once or twice at [Father's] home.  (N.T. 25)
>
> 18.  [Child] spontaneously told her mother what happened at [Father's] house in November 2011.  (N.T. 27, 50)
>
> * * *
>
> 65.  The testimony of [Father] with regard to the allegation he put his finger in [Child's] vagina is not credible.

9

ALJ Recommended Adjudication at 34-37.

The ALJ found that Child knew the difference between the truth and a lie and, based on her demeanor, testified credibly. The ALJ found it "inconceivable that a child of such tender years could tell such a consistent story to so many different people over such a protracted period of time." *Id.* at 46. The ALJ found the testimony of Counselor credible, noting that Child

> spontaneously disclosed during her counseling that [Father] had hurt her pee-pee and he scared her.

*Id.* Likewise, the ALJ found Mother credible and did not believe she had influenced Child's accusation.

On October 29, 2015, the Bureau adopted the recommended adjudication in its entirety. Father requested reconsideration by the Secretary of Human Services, but his request was denied. Father then petitioned for this Court's review.

On appeal,[6] Father argues that the Bureau erred. First, he contends that the 2011 report should be expunged because it contained some of the same accusations that appeared in the 2012 report. The expunction of the 2012 report requires the expunction of the 2011 report. Second, Father argues that there were procedural irregularities in the issuance of the 2011 indicated report that require its expunction. Third, he contends that the ALJ did not do the job required of a factfinder in a fair hearing. Specifically, the ALJ did not consider all of Child's testimony, such as her wild statements that Father deprived her of food and water

---

[6] Our review is to determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact are supported by substantial evidence. *A.P. v. Department of Public Welfare*, 98 A.3d 736, 741 n.2 (Pa. Cmwlth. 2014).

10

or the fact that over the years she has told very different versions of the touching incidents. The ALJ did not consider the possibility of taint, notwithstanding the evidence that Mother rehearsed Child for the January 2013 habeas corpus hearing; that there was a long period of time between the report of abuse to CYS and Child's interview by a forensic examiner while she was in Mother's exclusive custody; and that Child was aware that Mother did not like Father. Father argues that the ALJ's finding that he digitally penetrated Child on one or two occasions is not supported by substantial evidence. He asks the Court to reverse the adjudication and expunge the 2011 indicated report from the ChildLine Registry.

### Child Protective Services Law

An expungement hearing, or "Fair Hearing," determines the accuracy of information in an indicated report. Section 6341(c.2) of the Child Protective Services Law states, in relevant part, as follows:

> A hearing shall be scheduled according to the following procedures:
>
> * * *
>
> (4) The department or county agency shall provide a person making an appeal with evidence gathered during the child abuse investigation within its possession that is relevant to the child abuse determination, subject to sections 6339 (relating to confidentiality of reports) and 6340 (relating to release of information in confidential reports).
>
> (5) The department or county agency shall bear the burden of proving by substantial evidence that the report should remain categorized as an indicated report.

11

23 Pa. C.S. §6341(c.2).

The accuracy of a report turns, in large part, on the credibility of testimonial evidence. *R. v. Department of Public Welfare*, 636 A.2d 142, 144-45 (Pa. 1994). The county agency bears the burden of proving that the actions of the alleged perpetrator constitute child abuse within the meaning of the statute. *B.J.K. v. Department of Public Welfare,* 773 A.2d 1271, 1275 (Pa. Cmwlth. 2001). This is done with substantial evidence of abuse that outweighs contrary evidence. Specifically, Section 6303(a) of the Child Protective Services Law defines "substantial evidence" as

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a).

To meet this standard, "the child's testimony must be of such a quality" to allow the factfinder to conclude that it outweighs inconsistent evidence. *In re: S.H.*, 96 A.3d 448, 462 (Pa. Cmwlth. 2014). *In re: S.H.* considered the application of the statutory standard to a case where the child victim's testimony formed the sole basis for the finding of sexual abuse, *i.e.,* there was no physical evidence of abuse. Applying the statutory standard of proof, we explained, first, that all of the child's testimony must be considered, not just the selective parts that described abuse. Second, a young child's testimony that provides information generally outside the knowledge of a child can be probative of sexual abuse. *See, e.g., D.W. v. Department of Public Welfare* (Pa. Cmwlth., No. 922 C.D. 2013, filed March 11, 2014), slip op. at 5-6 (the "anatomically correct drawing of a penis from a six[-]year[-]old girl demonstrates a hypersexual knowledge way beyond her years, which could only have come from first hand contact with an adult penis.").

12

Third, the child's statement of abuse must not be elicited by leading questions and should be free of pre-hearing coaching.

It is axiomatic that the Department is the factfinder in expungement appeals and responsible for credibility determinations. *F.V.C. v. Department of Public Welfare,* 987 A.2d 223, 228 (Pa. Cmwlth. 2010). A child's accusations of abuse must be evaluated carefully in light of the fact that a child is vulnerable to adult influence. "Taint" is defined as

> the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of a child….

*Commonwealth v. Delbridge,* 855 A.2d 27, 35 (Pa. 2003). In *Delbridge,* the Supreme Court explained that a child's testimony is incompetent

> *where there is some evidence that improper interview techniques, suggestive questioning, vilification of the accused and interviewer bias may have influenced a child witness* to such a degree that the proffered testimony may be irreparably compromised.

*Id.* at 39 (emphasis added). In short, where a witness's memory of the event has been tainted, the testimony is incompetent. *Id.* at 40. *A fortiori,* incompetent testimony cannot be found credible.

**Analysis**

In his first issue, Father contends that the 2011 report must be expunged because the 2012 report was expunged.

The 2011 report described the abuse as follows: "[Child] reported to caseworker that [Father] touches her booty. She made a rotary motion with her

13

fingers on the dolls bottom. [Child] says he does that in [her] booty, inside of her body." C.R. Exhibit A-5. It also stated that "[v]ictim child had stuffed animals from home in the interview and picked one up and showed interviewer how perp rubbed victim child." *Id.*

The 2012 report focused on pornography. During her interview with Interviewer, Child reported that Father made her watch "bad movies," which she defined for Interviewer as "sex." C.R. Exhibit A-6. The 2012 report also stated that "[C]hild demonstrated for [mother] what they did in the videos." *Id.* CYS concluded that exposing Child to such movies constituted child abuse. The ALJ held that the County did not meet its burden on the 2012 report because not a single witness, neither Child nor Mother, testified that "[Father] had [Child] watch porn, bad movies or anything of that nature." ALJ Recommended Adjudication at 13.

The two reports overlap because the 2012 report repeated the accusation of Father's digital penetration of Child. It is obvious that this allegation referred to the one covered in the 2011 report because Father has not seen Child since 2011. In expunging the 2012 report, the ALJ could have clarified that he was not expunging the claim of digital penetration reported in the 2011 report. It does not follow, however, that the 2011 report should be expunged for this lack of precision on the part of the ALJ. In his recommended adjudication on the 2012 report, the ALJ stated that "the allegation of penetration is contained in the 2011 report and will be decided" in his adjudication of the 2011 report. ALJ Recommended Adjudication at 13. We reject Father's first assignment of error.

In his second issue, Father argues that 32 days passed between the November 18, 2011, report of Child's abuse and the filing of the investigation

14

report with ChildLine on December 20, 2011. The Department's regulation requires an investigation report to be filed within 30 days.[7] Father argues that because CYS did not timely file its investigation report, the 2011 report must be expunged from the ChildLine Registry.

The Department acknowledges that CYS filed its report two days late. Section 6368(n)(2) of the Child Protective Services Law also requires the county agency to do its investigation report within 30 days. 23 Pa. C.S. §6368(n)(2).[8]

_____

[7] The regulation states as follows:

> The report of the investigation shall be submitted to ChildLine within 30-calendar days of when the report was received at ChildLine.

55 Pa. Code §3490.32(e).

[8] Section 6368(n) states:

> Completion of investigation.--Investigations shall be completed in accordance with the following:
>
> > (1) Investigations to determine whether to accept the family for service and *whether a report is founded, indicated or unfounded shall be completed within 60 days in all cases*.
> >
> > (2) *If, due to the particular circumstances of the case, the county agency cannot complete the investigation within 30 days, the particular reasons for the delay shall be described in the child protective service record* and made available to the department for purposes of determining whether either of the following occurred:
> >
> > > (i) The county agency strictly followed the provisions of this chapter.
> > >
> > > (ii) The county agency is subject to action as authorized under section 6343 (relating to investigating performance of county agency).
> >
> > (3) Where a petition has been filed under 42 Pa.C.S. Ch. 63 (relating to juvenile matters) alleging that a child is a dependent child, the county agency shall make all reasonable efforts to complete the investigation to enable the hearing on the petition to be held as required by 42 Pa.C.S. §6335 (relating to release or holding of hearing).

23 Pa. C.S. §6368(n) (emphasis added).

15

Further, upon receiving a report of suspected child abuse, the county agency "shall immediately commence an investigation" and see the child, at the latest, within 24 hours. 23 Pa. C.S. §6368(b).

As part of the investigation, a caseworker, minimally, must interview the victim and the perpetrator, if the perpetrator can be located. 23 Pa. C.S. §6368(d)(4). In *D.C. v. Department of Human Services*, 150 A.3d 558, 563 (Pa. Cmwlth. 2016), this Court recognized that the Department's regulations encourage "a broader investigation." *See* 55 Pa. Code §3490.55(d). Regardless of the scope of the investigation, time is of the essence because within 60 days of the date of the initial report of child abuse, there must be a decision about whether the report is a founded, indicated or an unfounded report. 23 Pa. C.S. §6337(b). An indicated report of child abuse must be approved by a CYS administrator or the Secretary of Human Services, depending on which agency initiated the investigation. 23 Pa. C.S. §6368(e).

Here, the 2011 report gives no indication that Child was seen within 24 hours after CYS received a report of suspected child abuse. At the hearing, Caseworker testified:

> [Counsel for Department:] When this report comes in on November 18, 2011, is it assigned to you that day or shortly thereafter?
>
> [Caseworker:] Shortly thereafter.
>
> [Counsel for Department:] And what did you commence to do, if anything?
>
> [Caseworker:] We waited for the forensic interview to be scheduled, because it came in on a call; and a courtesy was asked of [another] County of the child.

16

N.T. at 111-112; R.R. 137a. The forensic interview did not take place until December 20, 2011. Likewise, the 2011 report does not record that CYS spoke to Father and what, if anything, Father stated. Again, at the hearing, Caseworker stated that she interviewed Father "once [she] got a hold of him by telephone." *Id.* at 114; R.R. 138a. But, on cross-examination, Caseworker could not recollect the date she contacted Father. *Id.* at 127; R.R. 141a. Although it took CYS more than 30 days to complete its investigation, the 2011 report is silent regarding a reason for this delay.

In numerous ways, CYS did not comply with the statute. It did not do a prompt interview or issue an investigation report in a timely manner. However, neither the statute nor the regulations state that these failures of CYS render the indicated abuse report invalid. Rather, such a failure authorizes the Department "to begin an inquiry into the performance of the county agency." 23 Pa. C.S. §6343(a). We are constrained to conclude that the Department did not err in failing to expunge the 2011 report on the basis of the procedural irregularities on the part of CYS.

In his third issue, Father argues that the County's evidence, *i.e.*, the testimony of Child, Mother and caseworkers, lacked the quality needed to satisfy the statutory definition of substantial evidence. The ALJ disregarded the many inconsistencies in Child's accusation of abuse and the evidence of Child's coaching by Mother before the hearing. Further, the ALJ overlooked Mother's opportunity to plant false memories in Child because CYS did not interview Child for a month after Mother contacted CYS. Likewise, the ALJ disregarded the evidence of Child's motive for fabrication, *i.e.*, Mother's *animus* toward Father. Interviewer was unaware that Mother had already initiated a proceeding to restrain

17

Father from seeing Child even before Interviewer spoke with Child. The Department responds that the record contains ample evidence that Father sexually abused Child on one or two occasions.

Father directs this Court to *In re: S.H.,* 96 A.3d 448 (Pa. Cmwlth. 2014), which he contends requires a reversal.[9] In that case, the father had requested expunction of an indicated report of sexual abuse. At the hearing, the child, who was 3½ years old at the time of the incident, testified that his father inserted a finger and a Q-tip into his anus during a weekend visit. The child's pediatrician, who testified by telephone, stated that several days after the incident, the child repeated his account of the father's conduct to the pediatrician. However, the pediatrician found no evidence of anal insertion or any basis for the child's abdominal and rectal pain reported by the mother. A clinical psychologist also testified, by telephone, that child spontaneously told her "Daddy pokes his finger in my butt." *Id*. at 451. Finally, the mother testified that she learned of the incident from her mother (maternal grandmother), who babysits the child each day. The mother and the father were involved in a custody dispute.

The father denied the child's account, and his denial was corroborated by the father's mother, who was present during the visit when the alleged incident occurred. The father also offered the testimony of a psychologist, an expert in the area of sexual abuse, who opined that the father did not meet the profile of a sexual abuser. Finally, the father offered the results of polygraph tests that had been administered by the Pennsylvania State Police, which he passed and the mother did not.

---

[9] Father cited this case as *G.H. v. Department of Public Welfare,* 2014 Pa. Cmmw. LEXIS 379 (Commw. Ct. 2013).

This Court directed the expunction of the report from the ChildLine Registry. In doing so, this Court observed that the child's testimony did not contain the type of information that in and of itself will corroborate sexual abuse, such as information that is generally outside the knowledge of a young child. Although the child had related the incident to his maternal grandmother, a critical witness, CYS did not interview her. Finally, the Secretary found the paternal grandmother, who had been present when the alleged abuse occurred, to be credible on most of the important and material facts. Those facts exonerated the father.

There are similarities between this case and *In re: S.H.* Both cases involve charges of sexual abuse by a young child that are not corroborated by physical evidence. In both cases, the criminal authorities declined to prosecute. Both cases involved a custody dispute. Unlike *In re: S.H.,* however, Father's categorical denial of abuse was not corroborated by other witnesses. We cannot conclude, as a matter of law, based upon the record before us, that *In re: S.H.* requires a reversal of the Department's adjudication.

The testimony of an accuser, alone, can be sufficient to prove child abuse. However, the ALJ must consider and address *all* relevant evidence and determine whether the child's testimony outweighs the contrary evidence presented. The ALJ must explain the rationale for the decision. The statute requires the ALJ to make findings, whether in favor of the county agency or in favor of the alleged perpetrator, on the basis of

> [e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion.

23 Pa. C.S. §6303(a).

Here, Child was four years old when the alleged abuse occurred, and seven years old by the time she testified before the ALJ. Over the course of years, she has told many different versions of this abuse on many occasions. On November 18, 2011, Child told the pediatrician that Father touched her vaginal area, which she demonstrated by rotating her finger in that area on a stuffed animal she brought with her. On that day, however, the doctor found "[n]o redness, no discharge, no obvious change of vaginal opening." C.R. Exhibit A-3. On December 20, 2011, Child told Interviewer that Father touched her inside her pee-pee after a bath while she was laying down on the bathroom floor. This started, according to Child, when Child was a baby. C.R. Exhibit C-4. On August 31, 2012, Child told Interviewer that Father put his finger in her "poopy" and in her "pee-pee" while she was in the shower with Father. On January 31, 2013, in the criminal proceeding before the charges were dropped, Child testified that Father put his finger in her "pee-pee" and "poopy" when she was in the bathroom. Finally, on May 27, 2014, before the ALJ, Child testified that Father came into the bathroom to wipe her but, instead, he put one finger inside her "pee-pee" and "boompty," which hurt her. N.T. at 18, 20-21; R.R. 114a-115a. Child testified that this happened "once or twice." N.T. at 25; R.R. 116a.

The ALJ acknowledged that some of Child's statements "could be hard to believe" and conceded there were inconsistencies between the various accounts of abuse stated by Child. ALJ Recommended Adjudication at 16. Nevertheless, the ALJ found Child credible:

> I carefully observed the subject child testify. I find that her testimony was credible. [Child] was able to understand the questions and convey her answers. For a child of her age, who has been required to repeat her story many times since the age of 4½, she was a good witness.

20

*Id.* at 15. Further, the ALJ found no evidence that Child

> had any bias, motive, or prejudice against [Father] prior to making her initial disclosure in 2011 at the age of 4½…. Without motive, it is unreasonable to believe that a young girl [Child's] age would make up allegations of sexual abuse by a man who she at the time called "dad" and loved visiting; and then continue with the allegations through the forensic interview, criminal hearings and an administrative hearing. There was no credible testimony or tangible proof that leads me to believe that [Child] would make up this story.

*Id.*

It is the factfinder's job not only to make credibility determinations, but to *explain* those determinations when doing the "weighing dynamic" required by 23 Pa. C.S. §6303(a). *A.P. v. Department of Public Welfare*, 98 A.3d 736, 744 (Pa. Cmwlth. 2014). The ALJ did not believe Father's denial that he ever put his finger in Child's vagina but did, apparently, believe Father's denial that he ever exposed Child to pornography. The ALJ also credited Father's testimony that Child loved visiting him and their summer vacation together. However, the ALJ used this against Father, noting that it was unreasonable to believe that Child would make up a story about someone she liked and called "dad." The ALJ made no observations about Father's demeanor as he did for Child. The ALJ did not explain why Child's inability to remember Aunt did not undermine her credibility.

The ALJ found that "there was no evidence of an underlying reason or motivation to suggest that [Child] would have lied or [Mother] would have fabricated these allegations with [Child]." ALJ Recommended Adjudication at 15. The ALJ did not consider the transcript from a hearing in a habeas corpus proceeding conducted on January 31, 2013, at which Child and Mother testified. At that proceeding, Child testified that Mother did not like Father, stating:

21

[Attorney:] And you have talked with [Mother] about [Father]; right?

[Child:] Uh-huh.

[Attorney:] She doesn't really – she doesn't really like [Father]; right?

[Child:] Right.

[Attorney:] When I asked you if she doesn't really like [Father] and you say right, how do you know she doesn't like him?

[Child:] Because she never like him.

[Attorney:] She never liked him?

[Child:] Yeah.

R.R. 59a-60a. Also, at this proceeding, Mother testified about her ongoing custody disputes with Father, stating:

[Attorney:] And when you told him that the baby was not his, he did not accept that so to speak; is that fair to say?

[Mother:] Yes.

[Attorney:] And you maintained that it wasn't his to the point where he had to go to the courts and do what we commonly call paternity tests?

[Mother:] Yes.

*\*\**

[Attorney:] This first thing you did was you told him it wasn't his daughter; correct?

[Mother:] I was really upset because I was trying – I was trying to get him to – we were trying to have some kind of relationship because I was pregnant….

*\*\**

22

[Attorney:] Okay. You do remember him taking a paternity test?

[Mother:] I do remember that.

***

[Attorney:] … you were resisting [Father's attempt to get greater visitation with Child] or fighting that; correct?

[Mother:] Well no. Whenever we went to court, like any mother, I was just – I wasn't fighting anything. I thought that going Friday through Sunday was enough time, because he had a full-time job and I was a stay-at-home mom. So being a stay-at-home mom, I didn't understand why he needed to have her all day Thursday or Thursday night and all day Friday when I was a stay-at-home mom staying at home for the reasons that I could watch her so that he wouldn't have to work and watch her at the same time.

***

[Attorney:] … Ma'am, you filed for modifications of visitation during this period of time. When he would get more, you actually went in, at least on one occasion, and asked the Court to change it back to less; correct?

[Mother:] … I don't remember. But when he got Thursday night through Sunday, I believe that I didn't understand why he would want Friday during the day when he works full-time and I'm a stay-at-home mom. So I just thought it would only be reasonable that he would pick her up Friday evening and return her Sunday night.

R.R. 18a, 20a-21a, 24a, 26a. In her interview with Interviewer, Child stated, "Father is mean and takes [her] away from Mother." C.R. Exhibit C-2 at 2.

A child is vulnerable to adult influence. *Delbridge,* 855 A.2d at 35. A child who believes her mother does not like her father could provide a motive for a child to fabricate. Likewise, a mother's dislike of a father, with whom she

23

has a custody dispute, could taint a child's statement. The ALJ found "no evidence of an underlying reason or motivation" for Child to lie without addressing Mother's *animus* toward Father that was identified by Child.

The ALJ stated that the transcript "only shows that mother rehearsed the child, perhaps to accurately repeat the same allegations she had consistently made over the years prior to the criminal hearing." ALJ Recommended Adjudication at 16. The ALJ did not consider the significant problem of any coaching of a young child at any time. It renders that child's testimony incompetent. *Delbridge*, 855 A.2d at 39. It causes

> [t]he implementation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, or other interested adults, that are so unduly suggestive and coercive as to infect the memory of the child….

*Id*. at 35. The fact that Child has repeated the central part of her accusation, *i.e.*, digital penetration, does not support her credibility, as suggested by the ALJ. The other facts surrounding that accusation have changed, such as where in the house the alleged abuse took place, the frequency of the alleged abuse, and what Child was doing at the time of the alleged abuse. Further, Child has been in the sole custody of Mother since November of 2011. Finally, the ALJ did not consider the gaps in Child's memory. For example, Child could not recall Aunt's identity, in spite of spending significant time with her.

The ALJ relied upon selective portions of the evidence, instead of considering the totality of the evidence. The ALJ reasoned that the pediatrician's reports supported Child's credibility, but they do not. Monthly, starting in June 2011, Child saw the pediatrician with complaints of painful urination and bowel

24

movements. In October 2011, the pediatrician discounted Child's complaints, attributing them to *"attention seeking behavior."* C.R. Exhibit A-3 (emphasis added). In May 2012, six months after Child's last visit with Father, she returned to the pediatrician with the very same complaints. Child's visits to the pediatrician with these complaints did not coincide in time with her visits with Father.[10] More problematic is that Child's complaints persisted into 2012, even though Child did not see Father after November 2011, when the accusation of sexual abuse was made.

Because the ALJ did not consider all the evidence that weighed against Child's testimony, we will vacate the adjudication and remand the matter for this exercise. The ALJ must consider all the above-discussed evidence that conflicts with the Child's accusation and explain all credibility decisions in order to satisfy the "weighing dynamic" required by 23 Pa. C.S. §6303(a).[11] The ALJ must address, specifically, the evidence of Mother's motive to influence Child and Child's statements regarding Mother's dislike of Father. The ALJ must consider the fact that Mother coached Child's testimony for the January 2013 habeas corpus

---

[10] The notes of Child's August 3, 2011, visit to the pediatrician did not record Mother's claim that on that visit she reported Child's "rocking motion" to the pediatrician. This visit took place before Child's vacation with Father and his family from August 12, 2011, to August 20, 2011. R.R. 131a.

[11] In *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014), Justice Saylor, now Chief Justice, contrasted the "substantial evidence" standard of Section 6303(a) of the Child Protective Services Law, 23 Pa. C.S. §6303(a), with the traditional substantial evidence standard of review under Section 704 of the Administrative Agency Law, 2 Pa. C.S. §704. Justice Saylor observed that "substantial evidence" under the Child Protective Services Law incorporates "a weighing dynamic generally reserved for fact-finding. Traditional appellate substantial-evidence review … omits all such weighing – instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *G.V.*, 91 A.3d at 674 (Saylor, J., concurring).

25

hearing.  The ALJ must consider whether Interviewer's interview techniques excluded the possibility of suggestion.  Finally, the ALJ must consider the limited scope of the investigation because CYS did not interview Child's Grandmother, for example.

## Conclusion

For these reasons, we vacate the Bureau's adjudication and remand for a new adjudication.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

M.L.,                      :
        Petitioner         :
                      :  **CASE SEALED**
    v.                   :  No. 2356 C.D. 2015
                      :
Department of Human Services,  :
        Respondent     :

## **ORDER**

AND NOW, this 6th day of March, 2017, the order of the Department of Human Services, Bureau of Hearings and Appeals, dated October 29, 2015, in the above-captioned matter is hereby VACATED, and this matter is REMANDED to the Department for further consideration consistent with this opinion.

Jurisdiction relinquished.

_____
MARY HANNAH LEAVITT, President Judge