IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.M.,                                          :
                Petitioner     :
                            :   No. 1180 C.D. 2017
       v.                                      :
                            :   Submitted: April 10, 2018
Department of Human Services,                  :
             Respondent      :   CASE SEALED


BEFORE:    HONORABLE ROBERT SIMPSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                            FILED: April 30, 2018


       J.M. (Petitioner) petitions for review of the July 27, 2017 final order of the Department of Human Services (Department), Bureau of Hearings and Appeals (BHA), which adopted the recommendation of an administrative law judge (ALJ), denying Petitioner's appeal to expunge an indicated report of child abuse.


**Facts and Procedural History**

       Petitioner is the mother of the subject child, G.H. (Child), a male born on March 17, 1999. Child's biological father was not a part of his life, and thus Child was raised by Petitioner. From 2010 to 2015, Petitioner had problems with alcohol. When drinking/drunk, she would say "mean and hateful" things to Child, such as that Child's father was not around because of Child, that Petitioner stayed with men in order to give

Child a good life, that he was ungrateful, and that Petitioner wished she were dead. (Findings of Fact (F.F.) Nos. 1-5.)

During that same period, Petitioner would inflict self-harm by cutting herself in Child's presence and, on one occasion, injured herself so badly that she required hospitalization. Petitioner would also threaten to commit suicide in front of Child, as well as take prescription pills.[1] Additionally, Petitioner was involved in an abusive relationship with her boyfriend, during which Child was concerned about Petitioner being harmed. (F.F. Nos. 6-9.)

In April 2015, there was an incident involving Child and Petitioner, which began as an argument about money but escalated to a point where Petitioner "trashed" Child's room and struck Child. (F.F. No. 10.) Child called the police and Petitioner was arrested and removed from the home. On the following day, the police returned to remove Child from the home and placed him in a teen shelter. During his time at the shelter, Child experienced suicidal ideations and went to the hospital for treatment. Petitioner ultimately pleaded guilty to a summary offense of harassment–subject other to physical contact. (F.F. Nos. 10-14.)

In December 2015, Child was evaluated by Dr. Terry O'Hara, a licensed psychologist, who diagnosed Child with unspecified depressive disorder and generalized anxiety disorder. Dr. O'Hara also believed Child demonstrated significant irritability, anxiety, panic, compulsive behaviors, depression, and symptoms of post-traumatic stress disorder (PTSD). Dr. O'Hara opined that Child's anxiety was chronic and severe and that Petitioner significantly contributed to Child's mental injury. (F.F. Nos. 16-20.)

_____

[1] Child testified that the pills were prescribed to Petitioner, but stated that he was unsure if she was taking them in an abusive manner or for the purpose of overdosing. (Reproduced Record (R.R.) at 116a-18a.)

2

On January 15, 2016, Blair County Children and Youth Services (Intervenor) received a report of alleged child abuse, conducted an investigation, and determined that Petitioner was the perpetrator of child abuse against Child as defined by the Pennsylvania Child Protective Services Law (Law).[2] Accordingly, Intervenor filed a report indicating that the allegations against Petitioner had been substantiated based upon documentation from Dr. O'Hara, which stated that Child's mental health had diminished due to emotional abuse inflicted by Petitioner, and Petitioner was registered on the ChildLine & Abuse Registry (ChildLine).[3] Petitioner appealed and requested expungement of her name from the ChildLine registry,[4] and a hearing was held before an ALJ.

Child testified at the hearing and stated that he presently lived with his grandparents and, although his mother does not live there, on the occasions that he does come into contact with her, he tries to avoid her. Child testified that, when he was six

---

[2] At the time Petitioner committed the alleged acts, section 6303(a) of Law defined "Perpetrator" as a "person who had committed child abuse and is a parent of a child . . . ." 23 Pa.C.S. §6303(a). The Law, including section 6303, was amended effective December 31, 2015. However, for purposes of this case, the relevant portion of the definition of "Perpetrator" did not change.

[3] Section 6331 of the Law states, in pertinent part:

> There shall be established in the department a Statewide database of protective services, which shall include the following, as provided by section 6336 (relating to information in Statewide database):
>
> . . .
>
> (3) Indicated and founded reports of child abuse.

23 Pa.C.S. §6331(3).

[4] A person named as a perpetrator in an indicated report of child abuse may request the secretary to expunge an indicated report on the grounds that it is inaccurate or it is being maintained in a manner inconsistent with the Law. 23 Pa.C.S. §6341(a), (b).

years old, he and Petitioner went to Arizona to visit Petitioner's friend. Child recalled that while he was sleeping on the couch, he heard his mother having sexual intercourse with a man in the next room, which made him very scared because he did not know "why she was making these sounds" and thought the man was hurting her. (R.R. at 104a.) Child stated that, at one point, he confronted her by pulling the covers off Petitioner, found her naked, and left the room crying. According to Child, this went on for approximately three to four days, during which time he recalled eating only cereal and becoming sick. (R.R. at 98a-104a.)

Child testified that he recalled his mother being in a number of unstable and unhealthy relationships with several men, including the father of Child's sister, A. He recalled that Petitioner and A.'s father frequently fought and that Petitioner would hit A.'s father in the chest. Child testified that he was aware that Petitioner was abused by A.'s father because he had seen her face bruised and bloody afterward. Child also recalled an incident that occurred when he was 13 years old, where Petitioner gave him $5.00 to watch A., who was three or four months old at the time, while Petitioner went somewhere for an hour. Child stated that Petitioner did not return until approximately four hours later, which upset him because A. was crying and needed her diaper changed, which he did not know how to do. (R.R. at 105a-09a, 111a-14a, 119a.)

With regard to Petitioner's drinking, Child stated that, for several years, Petitioner would get drunk every other night and say hurtful things to him, including that his father was not around because of Child and that she only stayed with certain men who had "a lot of money" so that Child would have a better childhood. (R.R. at 116a.) Child testified that this made him upset and depressed and that he was concerned she would hurt herself when she was drinking because there were multiple times "where she had cut herself, and even taken a lot of pills." (R.R. at 116a.) Child

4

stated that Petitioner had cut herself six to eight times in front of him and had threatened to commit suicide, which also upset him. (R.R. at 115a-18a.)

As to the incident in April 2015, Child stated that he was at his grandparents' house, where Petitioner also lived, and asked Petitioner for money so that he could go to the store to purchase shorts because he did not have any. Child testified that he recalled Petitioner was upset that day for some reason and started yelling. Child stated that A. became upset, cried, and indicated that she wanted Child to hold her, which angered Petitioner. Child testified that Petitioner then went to his room and "started throwing stuff around," pushed all of his video games off of a shelf, and threw a cup of fruit punch, stating, "put your sister down and I'll stop." (R.R. at 123a.) Child indicated that he refused because he did not feel that it was safe, since Petitioner was throwing things and was not stable. Child testified that Petitioner then grabbed the backpack he was wearing and started hitting him in the head and, when he tried to "shimmy her off," Petitioner clawed at Child's face, leaving him with scratch marks. (R.R. at 124a.) Child stated that he asked his uncle to call the police because his face was bloody and starting to bruise, but his uncle declined to get involved. Child stated that Petitioner then took A. downstairs and locked herself in a bathroom. Child called the police, who arrested Petitioner. (R.R. at 122a-28a.)

Child testified that the police returned the next day and took him to a teen shelter. Child stated that he felt "like [he] wasn't loved by anybody" and that nobody was there for him because his grandparents did not call to make sure that he was all right and "just let [him] stay in the teen shelter." (R.R. at 131a.) Child stated that, while at the teen shelter, he was very depressed and began having suicidal thoughts, at which point he was taken to a hospital, spoke with a doctor, and was released four hours later without any medications. Child stated that his suicidal thoughts came and

5

went over the following few weeks, but denied still having them. Child indicated that Petitioner moved out of the house immediately after the incident. (R.R. at 130a-35a, 166a-67a.)

Child stated that he believed the incidents with Petitioner negatively affected his mental stability. He said that he had seen a counselor when he was in seventh grade but did not know if that was who had originally diagnosed him with depression and anxiety. Further, Child stated that he had experienced panic attacks. Child testified that he went for 10 months without panic attacks, which he attributed to his lack of contact with Petitioner, but noted that he started experiencing them again before the hearing. Child also stated that he continued to have depression after his mother moved out but indicated that his anxiety lessened. Child acknowledged that he was presently seeing a counselor but agreed that it had not erased the memories of the events, which he felt had a very negative impact on his mental health. (R.R. at 119a-20a, 135a-40a.)

On cross-examination, Child agreed that a breakup with his girlfriend impacted him emotionally, as did getting bullied at school and the fact that his father was involved in a serious accident when Child was 12 years old. Child also acknowledged that his counselor, with whom he visits twice a month, did not recommend any medications for him. Child stated that he was previously prescribed medication for his depression and anxiety but had only taken it for three or four months because he does not like medication. Child acknowledged that he told Dr. O'Hara that he had a group of friends that he could talk to when he was feeling down. With regard to his grades in school, Child testified that, although he had failed a math class in tenth grade, he had never failed a grade level and his current grades were "decent." (R.R. at 158a.) As to activities outside of school, Child stated that he has worked at a restaurant

for the past 11 months, usually 20 to 25 hours a week, and noted that he had never missed a day of work. Child stated that he likewise never had issues with regard to his school attendance. Finally, Child agreed that he no longer had suicidal thoughts at the time of the hearing. (R.R. at 148a-60a.)

Dr. O'Hara also testified at the hearing and stated that he had been a licensed psychologist since 2004, specializing in forensic psychology, and that he routinely performed evaluations on adults and children, including those with emotional abuse and serious mental injury. Dr. O'Hara stated that he evaluated Child in December 2015. Prior to the evaluation, Dr. O'Hara stated that he reviewed a case summary written by Intervenor, as well as the police report from the April 2015 incident. Additionally, he stated that he was directed to the criminal website of the Blair County Court of Common Pleas and was able to view Petitioner's criminal history. (R.R. at 179a-87a.)

Dr. O'Hara noted that Child signed a release allowing him to contact Child's counselor; however, Dr. O'Hara stated that he was unable to do so prior to writing his report. (R.R. at 187a-88a.) Child also signed a release allowing Dr. O'Hara to speak with Child's grandmother, C.M. (*Id.*) Dr. O'Hara testified that C.M. alleged that her daughter had a history of mental issues, which included suicide attempts, and stated that Petitioner would "drink way too much and [could] become a crazy person." (R.R. at 192a.) Dr. O'Hara further recounted that C.M. stated that Petitioner claimed to be getting treatment for depression and PTSD but did not take responsibility for the poor choices she made. With regard to the impact on Child, Dr. O'Hara related that C.M. believed Child made good decisions and denied any behavior issues. However, Dr. O'Hara stated that C.M. acknowledged that Child suffered significant anxiety,

7

including while at school because of his relationship with Petitioner, and that he had come to "parent his mother instead of the other way around." (R.R. at 193a.)

Dr. O'Hara stated that he conducted an evaluation of Child and found that Child had a medical history involving a significant amount of depression and anxiety, as well as panic and PTSD symptoms, and was exhibiting irritability, compulsive behaviors, self-esteem issues, and "some inattention when he resided with his mother." (R.R. at 189a.) Dr. O'Hara stated that Child described various instances of physical abuse he suffered by his mother, including slapping or punching him, scraping open the skin near his eye while in a car, attempting to shut a door on his arm while drunk, and shoving him into the stairs. Dr. O'Hara stated that, based upon his evaluation and the allegations of "significant physical abuse," exposure to substance abuse, and significant instability when residing with Petitioner, Child's symptom presentation correlated "quite strongly to the events that he experienced when residing with his mother." (R.R. at 191a.) Dr. O'Hara stated that he did not have evidence that Child's age-appropriate developmental deeds or tasks or social tasks were negatively affected or that Child experienced psychosis or the reasonable fear that his life or safety was threatened. However, Dr. O'Hara opined that there was sufficient evidence Child experienced emotional abuse due to Petitioner's actions. Ultimately, Dr. O'Hara diagnosed Child with unspecified depressive disorder and generalized anxiety disorder and stated that, within a reasonable degree of psychological certainty, Petitioner intentionally, knowingly, or recklessly caused or substantially contributed to Child's emotional health issues. (R.R. at 189a-94a.)

On cross-examination, Dr. O'Hara acknowledged that he performed only one evaluation of Child, which lasted approximately an hour and a half; however, Dr. O'Hara clarified that he typically only does a one-time evaluation before determining

8

whether a child is a victim of child abuse. He likewise acknowledged that he was not able to obtain Child's medical or psychological records from Child's counselor and that he did not request pharmacy records to determine what medication Child was prescribed. With regard to police reports involving Petitioner, Dr. O'Hara stated that he had taken into consideration that Petitioner had pleaded guilty to harassment in 2015, public drunkenness in 2014, and disorderly conduct in 2013, but agreed that he was unaware of the disposition of the charges from the April 2015 incident at the time he wrote the report. (R.R. at 196a-203a, 207a-08a.)

When asked whether his diagnosis would have been different had he known that Child testified he went without panic attacks for 10 months, Dr. O'Hara stated that it would not. Dr. O'Hara explained that it was his understanding that significant mental injury requires the anxiety to be chronic and severe, and he opined the anxiety Child reported was chronic since he was experiencing it significantly every day. Dr. O'Hara noted that, although Child stated that his panic had lessened since his mother was removed from the household, it was his opinion that the anxiety Child experienced was nonetheless severe and chronic. (R.R. at 205a-06a.)

Finally, Dr. O'Hara stated that he typically requests to evaluate all parties involved, but, in this instance, he was unable to get Petitioner's perspective of the events. Despite that fact and that he did not review Child's school records, Dr. O'Hara stated that he believed he "still had sufficient evidence that [Child] was the victim of emotional abuse," given what he felt was Child's credible testimony, which was consistent with the police reports and with C.M.'s testimony. (R.R. at 211a.) Finally, when asked about his statement that Child had a "moderately elevated score on the depression scale," (*id.*), Dr. O'Hara clarified that "[m]oderately elevated would mean that that is in the realm of clinical significance." (R.R. at 212a.)

9

Petitioner was also called to testify at the hearing. Petitioner acknowledged having been in an abusive relationship with the father of A., who she was with for approximately three-and-a-half years, beginning when Child was eight or nine years old. She stated that, as a result of that relationship, she suffered psychological trauma and was diagnosed with depression, anxiety, and PTSD, for which she sought treatment. She stated that she took prescription medications but denied abusing them. Petitioner also acknowledged that, during the time she was living with her mother from 2010 to 2015, Child observed her cutting herself and that she was taken to the hospital as a result of one of the incidents. (R.R. at 258a-60a.)

Petitioner stated that, when Child was in seventh grade, he started receiving counseling, which Petitioner would sometimes attend with him, because he was being bullied in school. She stated that Child continued receiving counseling after they moved from State College to Altoona because he was "getting bullied, [did not] have friends, [and] his sister[ was] getting all of the attention." (R.R. at 263a-64a.) Petitioner testified that she and Child would argue about money because Child and his paternal grandparents felt that Child should have directly received his father's child support payments, instead of the allowance she gave him. (R.R. at 262a-64a.)

Petitioner further acknowledged that she had issues with alcohol but denied frequently being intoxicated in front of Child "because he was with his girlfriend a lot," and "it was only like on the weekends and stuff, because I had worked during the week . . . ." (R.R. at 265a.) Petitioner stated that she had since recovered from her alcohol problem and, although Alcoholics Anonymous meetings did not work for her, she had received outpatient therapy, was "on the right meds," had a "wonderful job," and was "in a really good place." (R.R. at 266a-67a.) Petitioner also acknowledged that she said mean things to Child when intoxicated, including that he

was ungrateful for the things she had given him and that she wished she were dead. (R.R. at 278a-79a.)

With regard to the incident in April 2015, Petitioner stated she and Child argued because he wanted money to buy shorts and that Child picked up his sister, A., because he knew it would upset Petitioner. Petitioner stated that it upset her because A. was yelling that she wanted her mother, and Child was "spitting and swearing," which Petitioner believed scared A. (R.R. at 288a.) Petitioner stated that she did not break anything in Child's room and "only threw stuff to try to get him to put her down," hoping that doing so would distract Child. (R.R. at 269a.) She also stated that she did not recall yelling and did not hit anything such as a Kool-Aid cup. Petitioner testified that she physically removed A. from Child by "bear hug[ging]" A. and acknowledged that her elbow "did hit [Child] in the cheek" and that Child "did end up with two scrapes on the side of the face," but stated that Child's swelling was from dental work and that he did not have bruising. (R.R. at 269a-70a.) Petitioner stated that she then took A. downstairs to get away from Child, after which the police came and criminal charges were filed against her. Petitioner acknowledged that she pleaded guilty to a summary harassment charge. (R.R. at 264a-71a, 288a-89a.)

Finally, Petitioner testified that she was not aware that Child was undergoing an evaluation by Dr. O'Hara until after it had taken place. She stated that she was aware that Child was on a "very light dose" of prescription medication for depression for a three-month period but did not like taking it. (R.R. at 273a.) Additionally, she stated she was aware of his panic attacks between 2007 and 2015, which were the reason that she took him to see a counselor, but noted that Child had attended school regularly and passed all of his grades. (R.R. at 271a-74a.)

11

In his decision, the ALJ found that Dr. O'Hara persuasively opined that Child demonstrated significant irritability, anxiety, panic, compulsive behaviors, depression, and symptoms of PTSD. Although Petitioner argued that Child's anxiety and depression did not rise to the level of chronic and severe, the ALJ gave deference to the expert medical witness, who made the determination that Child's anxiety was both chronic and severe within a reasonable degree of psychological certainty. Accordingly, the ALJ stated that, because the hearing record reflected that Child had suffered a serious mental injury under the Law, the ALJ next had to determine whether Petitioner caused or substantially contributed to the injury. (R.R. at 76a-77a.)

The ALJ noted that, in most cases of mental abuse, causation "does not involve a single event, but a pattern of behaviors over time that leads to an injury or an exacerbation of an injury," and thus stated that it was of import to look at the totality of circumstances to determine what or who impacted his mental injury. (R.R. at 77a.) As such, the ALJ stated that he took into consideration that Child was bullied after changing schools and began therapy to address it, but noted that it occurred while Child was in seventh grade, several years prior to the pertinent time period. Additionally, the ALJ stated that he considered that Child did not have his biological father in his life and that Child had different levels of relationships with the men in Petitioner's life. Further, the ALJ considered that Child had broken up with his girlfriend during the time period in question but noted that they had reunited by the time of the hearing. (*Id.*)

The ALJ emphasized, however, that although other factors may have been involved, the pertinent inquiry was who or what *substantially contributed* to the injury and thus focused on Petitioner's actions with regard to Child. The ALJ noted the above-listed findings of fact regarding Petitioner's drinking, suicide attempts, and the

12

April 2015 incident and found that Child credibly testified that those events caused him anxiety and depression, which bothered him a great deal. (R.R. at 77a.)

The ALJ noted that Dr. O'Hara was the only medical expert to testify and stated that his opinion must be given deference. The ALJ found that Dr. O'Hara was credible and persuasive with regard to his opinion that Petitioner caused/substantially contributed to Child's mental injury, since Child mentioned Petitioner as his stressor and Child's mental health improved when he no longer lived with her. (R.R. at 78a.)

The ALJ also found Child credible, since his testimony was consistent between the evaluation and the hearing and was factually similar to Petitioner's testimony. The ALJ stated that the witnesses' descriptions of the events were similar and any differences were likely due to the witnesses' standpoint rather than conduct. The ALJ stated that he did not "question [Petitioner's] credibility," since, "to her credit, [she] did not deny the alcohol issues, the self-harming, the verbal assaults, etc." (R.R. at 78a.) However, the ALJ found that those actions constituted the stressor that caused Child's mental injury. (*Id.*)

The ALJ concluded that, in evaluating at the totality of circumstances, there was substantial evidence that Petitioner's actions substantially contributed to Child's serious mental injury, citing Petitioner's intentional self-harming in front of Child, intentional exacerbation of an altercation which led to Child being injured and Petitioner's arrest, as well as that Petitioner "clearly acted recklessly in saying 'mean and hateful' things to [Child] when intoxicated." (R.R. at 78a.) Ultimately, the ALJ recommended that Petitioner's appeal be denied.

By order dated July 27, 2017, the BHA adopted the ALJ's recommendation in its entirety. Petitioner sought reconsideration, which was denied

by order dated August 18, 2017. Petitioner then filed a petition for review with this Court.

## Discussion

On appeal,[5] Petitioner argues that the record did not contain substantial evidence that (1) Child suffered a serious mental injury or, specifically, chronic and severe anxiety; or (2) Petitioner acted intentionally, knowingly, or recklessly in causing or substantially contributing to Child's serious mental injury and, in coming to the conclusion that she had, the ALJ erred in relying in part on incidents where "Petitioner was a victim of domestic violence and suffered from mental illness." (Petitioner's brief at 4.)

The county agency has the burden of proving the accuracy of the indicated report. 23 Pa.C.S. §6341(c); *R.J.W. v. Department of Human Services*, 139 A.3d 270, 282 (Pa. Cmwlth. 2016). "[I]n an expunction hearing the standard of proof is preponderance of the evidence, and the statutory standard for the evidence is '[e]vidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion. 23 Pa.C.S. § 6303(a).'" *A.P. v. Department of Public Welfare*, 98 A.3d 736, 742-43 (Pa. Cmwlth. 2014).[6] In order for

---

[5] In expungement proceedings, our scope of review is limited to determining "whether constitutional rights have been violated, whether the adjudication is in accordance with the law, or whether necessary findings of fact are supported by substantial evidence." *Beaver County Children & Youth Services v. Department of Public Welfare*, 68 A.3d 44, 47 n.4 (Pa. Cmwlth. 2013). Substantial evidence is that which "outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion." 23 Pa.C.S. §6303(a).

[6] In *A.P.*, we addressed the Supreme Court's decision in *G.V. v. Department of Public Welfare,* 91 A.3d 667 (Pa. 2014), which

14

the factfinder to reach a conclusion of abuse, "the 'evidence must so preponderate in favor of a conclusion that it outweighs . . . any inconsistent evidence and reasonable inferences therefrom.'" *R.J.W.*, 139 A.3d at 282 (quoting *In re S.H.*, 96 A.3d 448, 453 n.4 (Pa. Cmwlth. 2014)). When performing this "weighing dynamic," the factfinder must make and explain credibility determinations, and weigh the evidence "with reference to demeanor and substance of the testimony and all other evidence to enable meaningful appellate review." *A.P.*, 98 A.3d at 744-45. Whether the evidence satisfies the statutory standard is a question of law. *Id*. at 744.

The Secretary of the Department (or the Secretary's designee) is the ultimate factfinder in determining whether an indicated report has been proven accurate, *City of Philadelphia, Office of Children, Youth & Family Services v. Department of Public Welfare*, 767 A.2d 10, 12 (Pa. Cmwlth. 2001), and, as such, is free to accept or reject the testimony of any witness, either in whole or in part, *DePaolo v. Department of Public Welfare*, 865 A.2d 299, 305 (Pa. Cmwlth. 2005). In determining whether a finding of fact is supported by substantial evidence, the Court is required to give the party in whose favor the decision was rendered "the benefit of all reasonable and logical inferences that may be drawn from the evidence of record." *S.T. v. Department of Public Welfare, Lackawanna County Office, Children, Youth &*

---

cautioned against conflating the statutory standard at 23 Pa.C.S. §6303(a) with the "substantial evidence standard prevailing on appellate review under Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Id.* at 674 (Saylor, J., concurring). Justice Saylor [ ] explained the material difference. The statutory standard incorporates a "weighing dynamic." *Id.* "Traditional appellate substantial-evidence review, on the other hand, omits all such weighing—instead, this deferential form of review entails only an examination of whether the evidence, viewed in a light most favorable to the prevailing party, is adequate to support the administrative agency's factual findings." *Id.*

*A.P.*, 98 A.3d at 742.

*Family Services*, 681 A.2d 853, 856 (Pa. Cmwlth. 1996). Further, because determinations regarding credibility and weight of the evidence are for the factfinder, we will not disturb those determinations absent an abuse of discretion. *See R.J.W.*, 139 A.3d at 287.

Section 6303(b.1) of the Law defines "child abuse," in relevant part, as "intentionally, knowingly or recklessly . . . [c]ausing or substantially contributing to serious mental injury to a child through any act or failure to act or a series of such acts or failures to act."[7] 23 Pa.C.S. §6303(b.1)(3). The Law defines a "serious mental injury" as:

---

[7] The Act states that the terms "intentionally," "knowingly," and "recklessly" shall have the same meaning as provided in 18 Pa.C.S. §302 (relating to general requirements of culpability). 23 Pa.C.S. §6303(a). Section 302(b) of the Crimes Code provides, in relevant part:

> (1) A person acts intentionally with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such result; and
> >
> > (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.
>
> (2) A person acts knowingly with respect to a material element of an offense when:
>
> > (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exists; and
> >
> > (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

16

A psychological condition, as diagnosed by a physician or licensed psychologist, including the refusal of appropriate treatment, that:

> (1) renders a child chronically and severely anxious, agitated, depressed, socially withdrawn, psychotic or in reasonable fear that the child's life or safety is threatened; or

> (2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks.

23 Pa.C.S. §6303(a).

In her brief, Petitioner argues that there was not substantial evidence to support the ALJ's finding that Child suffered a serious mental injury because that finding was based in part upon Dr. O'Hara's report, which failed to consider several points that Petitioner believes were "significant and relevant." (Petitioner's brief at 21.) Specifically, Petitioner states that Dr. O'Hara failed to examine and explore matters "such as [Child's] medication history, school performance records, school attendance records, work history with attendance records, [and] medical records from [Child]'s treating counselor," and failed to speak with Child's treating counselor and to interview Petitioner. (Id.) Petitioner emphasizes that, after only "one clinical evaluation," Dr. O'Hara diagnosed Child with unspecified depressive disorder and generalized anxiety disorder, despite the fact that Child "was not previously diagnosed

---

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. §302(b)(1)-(3).

with anxiety or depression through prior treatment providers." (*Id.* at 22.) Petitioner further argues that Dr. O'Hara diagnosed Child with depression, but "found his depression to be moderate as opposed to chronic and severe." (*Id.* at 25.)

Petitioner also emphasizes that Child was "not prescribed any medications with respect to any depression or anxiety," "does well in school and will graduate . . . on time," maintains a part-time job after school, working 20-25 hours per week, "does not miss work as a result of any mental condition," and "has not become truant in school due to any alleged mental health diagnosis." (*Id.* at 26.) Petitioner asserts that, as such, the record does not contain substantial evidence that Child's conditions were chronic or severe.

Initially, we note that nearly all of Petitioner's arguments are challenges to evidentiary weight, which this Court will not disturb on appeal absent an abuse of discretion. *F.V.C. v. Department of Public Welfare*, 987 A.2d 223, 228 (Pa. Cmwlth. 2010). In order to demonstrate that Child suffered a serious mental injury under section 6303, Intervenor is required to show that Child suffered a "psychological condition, as diagnosed by a physician or licensed psychologist" that either "(1) renders a child chronically and severely anxious, . . . [or] depressed . . . ; **or** (2) seriously interferes with a child's ability to accomplish age-appropriate developmental and social tasks." 23 Pa.C.S. §6303 (emphasis added).

Here, Intervenor produced the testimony of Dr. O'Hara, a licensed psychologist, who testified that Child's anxiety was "severe and chronic." (R.R. at 206a.) The ALJ found Dr. O'Hara's testimony credible and persuasive. (F.F. No. 26; R.R. at 78a.) Although Petitioner asserts that Dr. O'Hara's failure to evaluate the above-mentioned items "creates considerable doubt in his ability to render his professional conclusions within a reasonable degree of certainty," Petitioner's

18

arguments amount to nothing more than attacks on the evidentiary weight of Dr. O'Hara's report and testimony.[8] *See G.W.K. v. Department of Public Welfare*, 558 A.2d 151, 153 (Pa. Cmwlth. 1989) (holding that whether the testimony of a child psychologist was credible was a question of credibility and evidentiary weight within the province of the factfinder). Thus, based upon a review of the record, we find that there was substantial evidence supporting the finding that Child suffered a serious mental injury.

Since Intervenor demonstrated a "serious mental injury" under the first prong of the definition, it was not required to additionally demonstrate it under the second prong. Thus, that Child did not miss work, fail grades, and was not truant is of no import with regard to whether they prove that Child was able to accomplish age-appropriate tasks. Likewise irrelevant is the question of whether or not Child's treating counselor diagnosed Child with any mental illness or recommended medications, as that counselor's testimony was not presented at the hearing, nor was it required under section 6303 to demonstrate the presence of a serious mental injury.[9]

---

[8] In her brief, Petitioner also argued that Dr. O'Hara's professional opinion was rendered questionable because he took into consideration "charged criminal conduct described in an affidavit of probable cause despite [Petitioner]'s presumption of innocence guaranteed by the Constitution of the United States." (Petitioner's brief at 8.) However, this argument likewise amounts to an attack on the evidentiary weight of Dr. O'Hara's testimony and report. Further, we note that Dr. O'Hara acknowledged that, at the time of the report, he was not aware of the ultimate disposition of all of the charges in the affidavit from the April 2015 incident; however, Dr. O'Hara explained that he found them significant and relevant nonetheless "given [the] allegations by other parties of [Petitioner's] significant psychological instability, especially when [] use[ing] alcohol" because the charges "included public drunkenness, disorderly conduct and harassment." (R.R. at 204a.)

[9] Although Petitioner faults Dr. O'Hara for failing to speak to Petitioner or Child's treating counselor, we note Dr. O'Hara's testimony that he attempted to reach out to both parties, but Petitioner "was not amenable" to speaking with him, (R.R. at 198a), and Child's counselor did not respond to his requests, (R.R. at 196).

Finally, with regard to Dr. O'Hara's use of the word "moderately" to describe Child's depression, Dr. O'Hara stated that Child had a "moderately elevated score on the depression scale." (R.R. at 211a.) When specifically asked about the term by Petitioner's counsel, Dr. O'Hara clarified, "Moderately elevated would mean that that is in the realm of clinical significance." (R.R. at 212a.) As noted by the ALJ, Dr. O'Hara specifically stated, "[I]n my opinion . . . the anxiety that [Child] experienced was severe and chronic." (R.R. at 206a.) Thus, Petitioner's assertion that "Dr. O'Hara later described [Child's] depression as **moderate** *and not chronic or severe as required under the law*," (Petitioner's brief at 22 (emphasis added)), is a blatant mischaracterization of the testimony of record.

Petitioner next argues that the ALJ erred in reaching the conclusion that Petitioner intentionally, knowingly, or recklessly caused or substantially contributed to Child's serious mental injury by relying in part on incidents in which Petitioner was a victim of domestic violence and suffering from mental illness. Petitioner acknowledges that Child observed episodes where Petitioner was the subject of domestic violence, but argues that, "[w]hile tragic and unfortunate, these episodes of domestic violence cannot be attributed to actions of [Petitioner]" because "[t]he fact that an abuser acted in a manner and at a time where [Child] was able to observe these episodes of abuse does not shift blame or the required state of mind to [Petitioner]." (Petitioner's brief at 38.) Petitioner asserts, "To conclude otherwise would be placing blame upon the victim for the abuse she suffered." (*Id.*)

With regard to the acts of self-harm Petitioner performed in front of Child, Petitioner argues that they were a result of her struggles with depression, anxiety, and PTSD and, "[a]s with most individuals who struggle with mental health, she was not acting intentionally but acting unintentionally due to her condition and mental health

diagnosis." (*Id.* at 39.) Without supporting legal authority, Petitioner concludes by asserting that it would be improper and an error of law to find that her actions of self-harm attributable to her mental health diagnosis were intentional or reckless and, instead, "should be stricken from the analysis." (*Id.* at 40.)

The Court agrees with Petitioner that mental illness is generally not a matter of choice and that Petitioner did not likely intend to cause Child harm. However, we disagree that Petitioner was not aware or would not have been practically certain that her actions—which included repeatedly cutting her wrists in front of Child, becoming intoxicated and saying admittedly mean and hurtful things, and engaging in physical violence against Child—would cause or substantially contribute to a serious mental injury to Child. Petitioner's alleged mental health issues,[10] though unfortunate, do not absolve her of her responsibility in causing or substantially contributing to Child's chronic and severe anxiety. Further, in listing the reasons for his conclusion that Petitioner substantially contributed to Child's serious mental injury, the ALJ outlined only incidents in which Petitioner was the actor. Notably, the ALJ did not cite Petitioner's episodes of domestic violence with her partner(s) as one of the supporting reasons for his conclusion. As such, we disagree that the ALJ erred as a matter of law.

## Conclusion

Based upon a review of the record, we conclude that there was substantial evidence to support the ALJ's finding that Child suffered a serious mental injury, to wit chronic and severe anxiety, due to Petitioner's intentional, knowing, or reckless conduct. Additionally, we disagree that, in making that finding, it was inappropriate

---

[10] Petitioner did not present any supporting evidence of a diagnosis beyond her own testimony.

21

for the ALJ to consider episodes in which Petitioner exposed Child to repeated self-harm and intoxication due to alleged mental illness.

Accordingly, the order of the BHA is affirmed.


_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J.M.,                                    :
              Petitioner               :
                                :   No.  1180 C.D. 2017
        v.                            :
                                :
Department of Human Services,            :   CASE SEALED
              Respondent             :

## _ORDER_

        AND NOW, this 30th day of April, 2018, the July 27, 2017 final order of the Secretary of the Department of Human Services is hereby affirmed.


                                  _____
                                  PATRICIA A. McCULLOUGH, Judge